# United States Court of Appeals
## For the First Circuit

No. 21-1414

LASHAUN CASEY,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Kayatta, Lipez, and Rikelman, Circuit Judges.

Virginia G. Villa for appellant.

Ricardo A. Imbert-Fernández, with whom W. Stephen Muldrow,
United States Attorney, and Mariana E. Bauzá-Almonte, Assistant
United States Attorney, Chief, Appellate Division, were on brief,
for appellee.

April 25, 2024

**LIPEZ**, **Circuit Judge**. Lashaun Casey was sentenced to life imprisonment after he was found guilty by a jury of carjacking and murdering an undercover police officer. See United States v. Casey ("Casey I"), 825 F.3d 1, 7-8 (1st Cir. 2016). Casey now seeks a writ of habeas corpus based on a violation of his Sixth Amendment right to effective assistance of counsel. See 28 U.S.C. § 2255. As relevant here, he claims that his trial attorney unreasonably failed to seek exclusion of inculpatory statements he made during a period of improper delay in bringing him before a magistrate judge following his arrest and detention. See Fed. R. Crim. P. 5(a)(1)(A); United States v. Galindo-Serrano, 925 F.3d 40, 45-46 (1st Cir. 2019). The district court rejected this "prompt presentment" claim, concluding that delay occurred but that it "was reasonable and necessary for legitimate law enforcement purposes." Casey v. United States ("Casey II"), 530 F. Supp. 3d 176, 188 (D.P.R. 2021).

We disagree that Casey's presentment was justifiably delayed, and we agree with Casey that admission at trial of one of the two contested sets of statements was therefore improper. We conclude, however, that Casey has not demonstrated that his trial counsel's failure to press that error constituted ineffective assistance of counsel because his showing of prejudice falls short of the Sixth Amendment standard. We therefore affirm the district court's judgment denying the writ of habeas corpus.

The factual and procedural details that underlie Casey's conviction and petition for habeas relief were recounted in both our opinion in Casey's direct appeal, see Casey I, 825 F.3d at 7-9, and the district court's opinion denying habeas relief, see Casey II, 530 F. Supp. 3d at 180-82. We set forth here the facts pertinent to the habeas appeal, drawing liberally from those prior opinions.

## A. Factual Background

### 1. The Planned Drug Deal and Aftermath

On August 1, 2005, Casey and undercover Agent Jesús Lizardi-Espada ("Lizardi") of the Puerto Rico Police Department ("PRPD") set off together for a drug buy that Casey had arranged with a supplier, Alexander Hernández. Lizardi and Casey, who was a target of a PRPD undercover drug-trafficking investigation, had interacted previously without incident, including for the purchase of a pound of marijuana earlier that same year. The August 1 plan called for the two men to meet Hernández in Culebra, an island off Puerto Rico's coast, traveling there by ferry from Fajardo. A team of PRPD agents, including Lizardi's supervisor, José Agosto-Rivera ("Agosto"), flew to Culebra in advance of the planned drug deal, for which Lizardi carried about $3,600 in cash. Agosto received three check-in calls from Lizardi that morning, including a final call that occurred after Lizardi picked up Casey at his

home and while Casey was making a restroom stop during their drive to the ferry terminal.

Agosto was waiting at the ferry terminal in Culebra and, when Lizardi and Casey failed to arrive as planned, Agosto called Lizardi's cellphone multiple times. Receiving no answer, he took a ferry back to Fajardo and began searching for the two men with other officers. Hours later, Agosto found Casey at the Holiday Inn where he worked and spotted Lizardi's truck in the employee parking lot. The vehicle was missing the driver's side window, and bloodstains and broken glass were visible inside. Casey was arrested at about 11:30 PM as he was driving off in Lizardi's truck.

### 2. Casey's Arrest and PRPD Custody

Officers first brought Casey to PRPD headquarters in Hato Rey, where he was read his rights and signed a Miranda waiver. Beginning at about 12:50 AM -- now August 2 -- he was questioned by PRPD Agent Diana Marrero. Casey told Marrero that he had gone with a friend named Jesus the previous morning to buy marijuana from people Casey knew, and Casey then fabricated a story about a shooting related to the drug purchase that led officers on an unproductive search for the missing agent at "the homes of individuals in the drug trafficking world." Casey II, 530 F. Supp. 3d at 180.

At about 6 AM, agents brought Casey to the PRPD police

- 4 -

station in Canóvanas.  Although he would remain in the physical custody of the PRPD until approximately 12:45 PM, it is undisputed that the FBI "assumed jurisdiction" over the case when Casey was relocated to Canóvanas at 6 AM.  Id.  While at Canóvanas, Casey told Marrero that he no longer wished to speak with law enforcement and asked to see his grandfather, with whom he lived.  At roughly 7:30 AM, Casey's grandfather, who had arrived at the Canóvanas station, gave consent for a search of Casey's bedroom at the home they shared in Luquillo.  There, agents recovered, among other items, a loaded firearm, Lizardi's cellphone, and a pair of bloodstained sandals.

### 3.  Casey's Statements While in FBI Custody

In the early afternoon, after a stop at a PRPD station in Luquillo, Casey was moved to FBI premises in Ceiba.[1]  At about 12:45 PM,[2] Casey was again read his rights and, according to FBI Agent Luis Moulier, chose to remain silent.

---

[1] Marrero testified at the suppression hearing that she "went along with [the FBI] to drop him off in Ceiba."

[2] The record is not entirely consistent on the timing of Casey's movement from one location to another, including his arrival in Ceiba.  Although the district court reported that "FBI agents transported Casey to its premises in Ceiba" "[s]hortly after 12:00 p.m.," Casey II, 530 F. Supp. 3d at 180-81, Marrero testified that she arrived in Ceiba with Casey and the FBI agents at 1:55 PM.  Some differences are likely attributable to travel times.  In any event, despite the variations, we can reasonably conclude that Casey arrived at Ceiba no earlier than 12:45 (and probably closer to 1:55 PM).

At about 2 PM, PRPD Agent Marrero again questioned Casey, this time in the presence of an FBI agent who, early in the interview, told Casey about the evidence that had been found in his bedroom. Marrero testified at trial as follows when asked by government counsel what Casey told her during this interview:

> **Marrero**: It was already in the afternoon and he was asked again if he had any knowledge of where Mr. Jesus Lizardi was, and he said Mr. Jesus was maybe alive or maybe he was dead.
> **Government**: Did he say anything else?
> **Marrero**: He was asked why he was saying that, and he said that he was not going to talk any more, because he was already sunk because of the evidence and that if he would get an attorney then he could continue talking to us.
> **Government**: After he asked for an attorney did you continue to interview him?
> **Marrero**: We remained silent and later he was asked something else, but he didn't answer anything else.[3]

---

[3] This is the first set of comments that Casey challenges here on presentment grounds as improperly admitted into evidence. Marrero also reported some additional comments by Casey that the district court suppressed because they were made after he invoked his right to counsel. See Casey II, 530 F. Supp. 3d at 181 & n.3; see also Casey I, 825 F.3d at 19-21. Those suppressed statements are not at issue in this appeal, and we therefore do not quote them here.

We note, relatedly, that Casey did not argue to the district court that his statements to Marrero should be suppressed based on his invocation of his right to remain silent, which he first asserted at Canóvanas and later repeated to Agent Moulier at Ceiba. See Casey I, 825 F.3d at 19-21 (noting Casey's failure to raise a claim based on Michigan v. Mosley, 423 U.S. 96 (1975)); United States v. Casey ("Casey III"), No. 05-277, 2013 WL 12190563, at *6 n.15; *8 n.18 (D.P.R. Jan. 23, 2013). Although he raised the Mosley argument in his direct appeal, we deemed it waived. See Casey I, 825 F.3d at 21. The district court found no merit to the claim in its decision on Casey's motion for relief under 28 U.S.C. § 2255. See Casey II, 530 F. Supp. 3d at 184-86. Casey made no

At about 4:15 PM, Casey met with his wife in an interview room in the Ceiba location, in the presence of a PRPD agent who was at that time assigned to the FBI. The agent overheard the couple's conversation and testified at trial that Casey said to his wife, among other things, that "in the house they seized a lot of evidence but that they weren't going to find the body." The agent reported that Casey also assured his wife "that he was going to come out of this case well," while referencing a prior drug case "they had come out of . . . okay."[4]

### 4. Casey's Presentment and Criminal Charges

Casey was taken to the Metropolitan Detention Center in Guaynabo, arriving at about 11:30 PM on August 2, and he made his initial appearance before a federal magistrate judge the next day, August 3, at 11:35 AM. The criminal complaint filed against him asserted federal drug and firearms violations, including unlawful possession of a firearm by a felon and possession of a firearm in

---

developed argument on the Mosley claim in his pro se application to us for a certificate of appealability, and we therefore do not address it. See, e.g., United States v. Nishnianidze, 342 F.3d 6, 18 (1st Cir. 2003) (finding pro se argument waived for failure to develop argument on appeal).

[4] This is the second set of comments that Casey asserts here were improperly admitted at trial in violation of his right to prompt presentment. At a suppression hearing, the same agent testified to additional overheard statements, see Casey I, 825 F.3d at 20, but those statements were not repeated at trial, and we therefore do not consider them here.

furtherance of a drug trafficking offense.  The affidavit submitted with the complaint, signed by FBI Agent Moulier, reported that Casey was arrested by the PRPD when he was found driving the vehicle of an undercover agent with whom authorities had lost contact and who had been conducting a drug transaction with Casey.

Lizardi's body was found a few days later in a wooded area behind an abandoned building in Luquillo.  He had been shot twice in the head.  The evidence gathered by authorities during the investigation and eventually presented at Casey's 2013 trial established decisively that Casey was, at the very least, present when Lizardi was shot.  The government's case included compelling physical evidence and related testimony showing that Casey drove Lizardi's truck out of the parking lot at the ferry terminal in Fajardo and paid the parking fee with a $20 bill that contained traces of Lizardi's blood.  Further, a vehicle window found in this same parking lot, with what appeared to be a bullet hole in the middle, was identified as likely the window that was missing from Lizardi's truck -- the vehicle Casey was driving when he was arrested.  Authorities also retrieved a bullet from the parking lot that matched the ammunition in the gun found in Casey's bedroom.  Lizardi's backpack was found about a mile from Casey's home and down the street from the home of Hernández, the drug dealer whom Casey and Lizardi had been planning to meet.  FBI analysis concluded that the bloodstain on the sandals seized from

Casey's home likely contained Lizardi's DNA.

## B. Procedural Background

Casey was charged with federal crimes in an indictment filed in August 2005, shortly after Lizardi's body was found. In early 2007, a superseding federal indictment containing three counts charged Casey with: (1) carjacking with the intent to cause death or serious bodily injury, in violation of 18 U.S.C. § 2119(3); (2) possession, use, discharge, and carrying of a firearm during a crime of violence -- the carjacking -- and, in the course of that crime, shooting Lizardi, "thus causing his death," in violation of 18 U.S.C. § 924(j); and (3) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The superseding indictment also contained a "Notice of Special Findings" rendering Casey eligible for the death penalty. See 18 U.S.C. §§ 3591(a), 3592(c).

Pretrial proceedings, including the litigation of issues concerning the death penalty and suppression motions, continued through early 2013. As relevant here, Casey moved to suppress on various grounds[5] the two sets of statements that he made in the

---

[5] Casey argued, inter alia, that all of his post-arrest statements were involuntary because he had been assaulted at the time of his arrest, "causing him to involuntarily waive his Miranda rights," Casey III, 2013 WL 12190563, at *5, and he alternatively argued that all statements should be suppressed based "upon his invocation of the Miranda right to counsel," id. at *6.

afternoon of August 2 at the Ceiba FBI location: his comments to Agent Marrero in response to questions about Lizardi's whereabouts and his overheard conversation with his wife shortly thereafter. See United States v. Casey ("Casey III"), No. 05-277, 2013 WL 12190563, at *2 (D.P.R. Jan. 23, 2013). The district court, as noted above, suppressed comments elicited by Marrero after Casey invoked his right to counsel during the interview at Ceiba but otherwise denied the motions. The court rejected Casey's claim of coercion based on an "alleged physical assault by police officers," id. at *8, and it refused to suppress Casey's overheard comments to his wife on the ground that their conversation was not "the 'functional equivalent' of a custodial interrogation." Id. at *10 (quoting Arizona v. Mauro, 481 U.S. 520, 527 (1987)).[6] Casey did not seek suppression based on undue delay in bringing him before a magistrate judge.

The guilt phase of Casey's trial spanned twenty-four

---

[6] To briefly reiterate, the comments made by Casey that the district court refused to suppress, and which are challenged here on presentment grounds, include the following:

(1) To PRPD Agent Marrero: that Lizardi "was maybe alive or maybe he was dead," followed by his statement "that he was not going to talk any more[] because he was already sunk because of the evidence." In its closing and rebuttal arguments, the government paraphrased the second quoted comment as "I am sunk with the evidence." See infra.

(2) To his wife: that "in the house they seized a lot of evidence but . . . they weren't going to find the body."

days in February and March 2013. The carjacking charges, as presented to the jury, required the government to establish beyond a reasonable doubt that Casey not only was present at the scene of the murder but also that he took the truck from Lizardi with the intent to seriously injure or kill him, and that he did the shooting. The core of Casey's defense was that he had no such intent and that the murder was committed unexpectedly by Hernández, the drug dealer whom he had arranged to meet with Lizardi. The jury found Casey guilty on all three counts, but it subsequently rejected the death penalty. The district court thereafter sentenced Casey to life imprisonment on Counts 1 and 2 -- the counts based on the carjacking and Lizardi's death -- and to a ten-year term of imprisonment on the felon-in-possession count.[7]

Casey appealed and, among his arguments, he claimed for the first time that his statements to Marrero and his wife should have been suppressed because the government failed to bring him promptly before a magistrate judge. See Casey I, 825 F.3d at 20-21. In a single paragraph, we deemed that claim waived and declined to consider it. Id. at 21. After the Supreme Court denied certiorari, Casey submitted a timely habeas petition pursuant to 28 U.S.C. § 2255 asserting ineffective assistance of counsel on multiple grounds, including his attorneys' failure to

---

[7] Casey does not challenge his conviction for being a felon in possession of a firearm or the sentence imposed on that count.

seek suppression of his statements based on the violation of his right to prompt presentment. We ultimately granted a Certificate of Appealability ("COA") solely on the prompt presentment issue.[8]

## II.

## A. Applicable Law

### 1. Ineffective Assistance of Counsel

To succeed with an ineffective assistance of counsel claim under 28 U.S.C. § 2255, a petitioner must show both that his "counsel's representation fell below an objective standard of reasonableness" (the performance prong) and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong). Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). The petitioner bears a heavy burden on each prong.

We will find deficient performance "[o]nly when counsel's strategy was 'so patently unreasonable that no competent attorney would have made it.'" Watson v. United States, 37 F.4th 22, 28 (1st Cir. 2022) (quoting Tevlin v. Spencer, 621 F.3d 59, 66

---

[8] Specifically, we granted the COA limited to the following question: "[W]hether, under the framework set out in Strickland v. Washington, 466 U.S. 668, 687 (1984), trial counsel rendered ineffective assistance by not moving to suppress statements by Casey made after the expiration of the 'safe harbor' recognized at 18 U.S.C. § 3501(c)." We explain the safe-harbor provision in Section II.B.

- 12 -

(1st Cir. 2010)).  To give the required deference to counsel's choices, we "strongly presume[]" that the attorney "[has] rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690.  Nonetheless, "the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial."  Murray v. Carrier, 477 U.S. 478, 496 (1986).

With respect to the prejudice requirement, although the petitioner does not need to show that any asserted errors more likely than not affected the jury's verdict, it is not enough "to show that the errors had 'some conceivable effect on the outcome.'" González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (quoting Strickland, 466 U.S. at 693).  Instead, the petitioner must show a "reasonable probability" of a different result at trial -- that is, "one 'sufficient to undermine confidence'" in the verdict.  Id. (quoting Strickland, 466 U.S. at 694).

## 2.  The Right to Prompt Presentment

Federal Rule of Criminal Procedure 5(a)(1)(A) provides that a defendant who has been "arrest[ed] within the United States must [be] taken . . . without unnecessary delay before a magistrate judge."  This right to prompt presentment is designed to "avoid all the evil implications of secret interrogation of

- 13 -

persons accused of crime," McNabb v. United States, 318 U.S. 332, 344 (1943), and "ensure[] that the defendant 'may be advised of his rights' 'as quickly as possible' and that 'the issue of probable cause may be promptly determined,'" Galindo-Serrano, 925 F.3d at 46 (quoting Mallory v. United States, 354 U.S. 449, 454 (1957)).[9]  Under "the rule known simply as McNabb-Mallory," Corley v. United States, 556 U.S. 303, 309 (2009), "confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)" are inadmissible in evidence, id. (alteration in original) (quoting United States v. Alvarez-Sanchez, 511 U.S. 350, 354 (1994)).

However, "the McNabb-Mallory exclusionary rule" has been qualified in two ways.  Galindo-Serrano, 925 F.3d at 46.  First, 18 U.S.C. § 3501 establishes a safe-harbor period for certain voluntary confessions obtained "within six hours immediately following . . . arrest or other detention," stating that they are

---

[9] The Supreme Court has elaborated on the importance of presentment, explaining that it is

> the point at which the judge is required to take several key steps to foreclose Government overreaching: informing the defendant of the charges against him, his right to remain silent, his right to counsel, the availability of bail, and any right to a preliminary hearing; giving the defendant a chance to consult with counsel; and deciding between detention or release.

Corley v. United States, 556 U.S. 303, 320 (2009).

not "inadmissible solely because of delay in bringing such person before a magistrate judge or other officer." 18 U.S.C. § 3501(c); see also United States v. Jacques, 744 F.3d 804, 813 (1st Cir. 2014). Section 3501 further provides that a confession made outside the six-hour safe-harbor period may be admitted into evidence if the trial judge finds that the defendant's statements were voluntary and the delay beyond six hours was "reasonable considering the means of transportation and the distance to be traveled to the nearest available . . . magistrate judge or other officer." 18 U.S.C. § 3501(c); see also Corley, 556 U.S. at 322 (describing revision of the McNabb-Mallory rule by § 3501(c)).

We have recognized that the reasonableness inquiry may encompass factors other than "the means of transportation and the distance to be traveled." 18 U.S.C. § 3501(c). See Jacques, 744 F.3d at 814-15. The question is whether "th[e] delay is based on reasonable or legitimate grounds." Id. at 814. We previously have summarized some of the relevant considerations:

> A delay "is unreasonable and unnecessary when it is 'of a nature to give opportunity for the extraction of a confession.'" United States v. García-Hernández, 569 F.3d 1100, 1106 (9th Cir. 2009) (quoting Mallory, 354 U.S. at 455). However, a delay may be reasonable if caused by administrative concerns, such as the unavailability of a magistrate following an arrest, or by a shortage of personnel[.]

Id. (citations omitted); see also Fed. R. Crim. P. 5 advisory committee's note to 2002 amendment (recognizing the occasional

- 15 -

need for delay in presentment, "for example, due to weather conditions or other natural causes"); United States v. Boche-Perez, 755 F.3d 327, 337 (5th Cir. 2014) (noting that "[d]elays so that the arrestee can receive medical care and/or sober up have also long been sanctioned" (citing cases)).

As we have emphasized, however, the "administrative concerns" that are claimed to justify a delay must in fact support a legitimate need for additional time to bring a defendant before a magistrate judge. See generally Galindo-Serrano, 925 F.3d at 48-49. Otherwise, an extended interval between detention and presentment will amount to the unacceptable delay prohibited by Rule 5 and McNabb-Mallory: delay that is "of a nature to give opportunity for the extraction of a confession." Mallory, 354 U.S. at 455; see also Galindo-Serrano, 925 F.3d at 48 ("Delay for the purpose of interrogation is the epitome of unnecessary delay." (internal quotation marks omitted) (quoting Corley, 556 U.S. at 308, in turn quoting Mallory, 354 U.S. at 455-56)); Boche-Perez, 755 F.3d at 336 ("A non-existent explanation (i.e., delay for delay's sake) is unacceptable under McNabb-Mallory because a delay for delay's sake is, by definition, unnecessary to any legitimate law enforcement purpose.").

## III.

### A. Standard of Review

In reviewing a district court's denial of a § 2255

petition, we evaluate its legal conclusions de novo and its factual findings for clear error. See Thompson v. United States, 64 F.4th 412, 418 (1st Cir. 2023). We may start our analysis with either prong of the ineffective assistance inquiry. Because we ultimately conclude that Casey cannot show the requisite prejudice, we could bypass any discussion of the performance prong. See, e.g., United States v. Carrigan, 724 F.3d 39, 45 (1st Cir. 2013). However, such avoidance here would leave in place an untenable view of the prompt presentment requirement, reflected in the reasoning of both the district court in its decision on Casey's habeas petition and the government in its defense of that ruling. We are concerned that those errors may reflect a broad misapprehension of the prompt presentment requirement. We therefore deem it important to address Casey's argument that the court erred in its treatment of his McNabb-Mallory claim. See Galindo-Serrano, 925 F.3d at 47-49 (rejecting prompt-presentment claim as waived but discussing the district court's finding of reasonable delay "to clarify the law in this area"). We thus begin with the performance prong of Casey's ineffective assistance claim.

## B. Was Counsel's Performance Deficient?[10]

As the district court observed, a petitioner cannot establish deficient performance without first showing an actual

---

[10] We note that Casey's current attorney did not represent him during the pretrial and trial proceedings.

trial error.  See Casey II, 530 F. Supp. 3d at 186; Johnston v. Mitchell, 871 F.3d 52, 60 (1st Cir. 2017).  In rejecting Casey's Sixth Amendment claim, the court found that he failed to make such a showing.  The performance inquiry in this case thus requires us to first review the district court's ruling that no Rule 5 violation occurred.  Because we disagree with that conclusion, we must go on to determine whether counsel's failure to seek suppression based on the prompt presentment violation was representation that fell below an objective standard of reasonableness.

### 1.  The McNabb-Mallory Violation

Despite the span of thirty-six hours between Casey's arrest and his appearance before the magistrate judge -- and roughly fifteen hours between his detention and the statements he challenges -- the district court held that Casey's prompt presentment claim lacked merit because the delay was "reasonable and necessary for legitimate law enforcement purposes, namely, to locate Agent Lizardi."  Casey II, 530 F. Supp. 3d at 188.  Hence, according to the court, the failure of Casey's attorney to move for suppression of his statements based on McNabb-Mallory and § 3501(c) was not unreasonable, and Casey thus could not satisfy the deficient performance prong of his ineffective assistance claim.  Id.

- 18 -

Rule 5's requirement of prompt presentment applies only to a period of federal detention. See Alvarez-Sanchez, 511 U.S. at 358. There is no factual dispute concerning the length of Casey's detention, and it is likewise uncontested that the FBI assumed jurisdiction over the case at 6 AM on August 2. The question whether a prompt presentment violation occurred is thus an issue of law subject to de novo review. See Thompson, 64 F.4th at 418. That issue encompasses two subsidiary questions: (1) at what point did the six-hour safe-harbor period provided in § 3501(c) begin, and, (2) if that period was exceeded before Casey made the remarks he claims should have been suppressed, was the delay reasonable?

**(a) The Prompt Presentment Clock**

Casey asserts that the prompt presentment clock began running when the FBI assumed jurisdiction at 6 AM, with the safe-harbor period thus ending at noon. The government disagrees, maintaining that the six-hour period did not begin until about 12:45 PM, when the FBI took physical custody of Casey from the PRPD. The government, however, offers no support for the proposition that Casey's physical location is the determining factor. The cases cited by the government in its brief, involving defendants who were in state custody based solely on state charges, are inapposite. Although the federal and state authorities in those cases had overlapping interests -- as did the PRPD and FBI

- 19 -

in this case -- the defendants remained under state jurisdiction when they made the statements they sought to suppress. See, e.g., United States v. Hall, 152 F.3d 381, 426 (5th Cir. 1998) (defendant was in custody solely on state charges, though a separate warrant had been issued based on a federal complaint), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304, 310-11 (2000); United States v. Barlow, 693 F.2d 954, 957-59 (6th Cir. 1982) (defendant's interview by the FBI occurred while he was in state custody following arrest on a state charge); United States v. Watson, 591 F.2d 1058, 1062 (5th Cir. 1979) (per curiam) (confession to FBI agent who had obtained a federal arrest warrant occurred while defendant was in state custody on state charges). Indeed, if federal authorities could escape Rule 5's obligation based solely on the delay in transferring physical custody of the individual from state authorities, the protection afforded by the prompt presentment requirement would be severely diminished.[11]

---

[11] In Alvarez-Sanchez, the Supreme Court noted the likelihood of contemporaneous federal and state interest in a detainee and emphasized that § 3501(c) is not triggered simply because a federal crime is lurking in the background; the provision does not apply if the person is "held only on state charges by state or local authorities." 511 U.S. at 358. Relatedly, the Supreme Court noted the "presumably rare scenario" in which "state or local authorities, acting in collusion with federal officers, . . . arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment." Id. at 359 & n.4 (citing Anderson v. United States, 318 U.S. 350, 356 (1943)). Such an "improper collaboration

At oral argument before this court, the government offered two related rationales to support its contention that the transfer of jurisdiction to the FBI at 6 AM was not the relevant timing for § 3501(c). First, the government stated that the FBI assumed only "investigatory jurisdiction" at that time and not jurisdiction over the prosecution, suggesting that only the latter would include responsibility for Casey's detention. Second, the government pointed out that the crimes charged in the federal complaint -- most notably, that Casey was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)[12] -- only became available when agents discovered the gun during their search of Casey's bedroom sometime after 7:30 AM on the morning of August 2. Hence, according to the government, the obligation to meet the timeline set by § 3501(c) could not have arisen until after the FBI had completed the search and obtained the evidence to support

_____

between federal and state or local officers" would require suppression of a confession obtained during that contrived period of state detention. Id. at 359. We need not delve into the motivation for holding Casey in state custody until midday on August 2 because of our conclusion that the prompt presentment clock was triggered when federal authorities assumed jurisdiction at 6 AM. See infra. Hence, unlike circumstances in which state or local authorities may have detained an arrestee -- or prolonged such detention -- to avoid the prompt presentment requirement, we have determined that the clock was running while Casey remained in PRPD custody throughout the morning.

[12] The other two crimes asserted in the initial complaint, both involving marijuana possession, were later replaced in the indictment by the carjacking crimes.

the crimes alleged in the complaint.  In essence, this second argument is a variation of the government's position that it took over the investigation at 6 AM, but not the prosecution.

These arguments are unpersuasive on the record before us.[13]  Beginning with the second point, the fact that the criminal complaint charged crimes that depended on the evidence obtained in the search does not determine whether the prompt presentment clock started with the transfer of jurisdiction at 6 AM.  Although the discovery of the gun gave federal authorities an irrefutable and straightforward basis for justifying Casey's detention, the question is whether federal authorities had in fact assumed responsibility for Casey's detention earlier in the day.  In other words, the FBI's choice to use the firearm for the criminal complaint does not tell us whether Casey was being held in connection with federal crimes even before the search took place.

The government's position that the FBI took over only "investigatory" responsibility for the case at 6 AM -- leaving Casey detained under the authority of the PRPD as well as in its

---

[13] We think it important to note that an evidentiary hearing on Casey's § 2255 petition likely would have provided helpful details on the decision to shift jurisdiction to the FBI.  Casey requested a hearing, but the government argued that it was unnecessary, and the district court denied Casey's request.  The government thus bears some responsibility for the absence of any information in the record that might have been helpful to it on the jurisdiction issue.

custody -- is at odds with the circumstances reflected in the record. The PRPD and the FBI were investigating the same criminal activity -- the disappearance of, and apparent harm to, an undercover officer, along with the presumably unauthorized taking of his vehicle. The facts known early in the investigation not only indicated criminal activity chargeable under Commonwealth law but also a violent carjacking chargeable under 18 U.S.C. § 2119 even without the later-discovered gun.[14] It thus appears that the two agencies concluded, as of 6 AM on August 2, that the crime or crimes should be prosecuted under federal law. Indeed, no Commonwealth charges were ever filed.[15]

---

[14] As noted above, when Casey was apprehended in Lizardi's truck, the vehicle was missing the driver's side window, and bloodstains and broken glass were visible inside. The federal carjacking statute provides, in relevant part:

> Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce shall--
>
> (1) be fined under this title or imprisoned not more than 15 years, or both . . . .

18 U.S.C. § 2119. Subsection (3) provides that, "if death results," the person charged may "be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death." The authorities also knew that Casey had fabricated a story about a shootout shortly after his arrest by the PRPD.

[15] Neither the district court in its opinions nor the government in its brief on appeal specify the Commonwealth crimes for which Casey was arrested by the PRPD, although it appears that

None of the facts cited by the government suggest that the shift in jurisdiction changed the justification for detaining Casey that had prompted his arrest and detention by the PRPD -- namely, probable cause to believe that he had committed a violent crime, possibly murder, and had stolen the victim's vehicle. The only apparent change was that Casey was now being detained for the federal crimes associated with that conduct -- and, consequently, the prompt presentment clock began to run. See Alvarez-Sanchez, 511 U.S. at 358 (stating that the duty to bring a person before a judicial officer arises when "a person is arrested or detained for a federal crime" (emphasis added)). It does not matter that Casey remained physically in the custody of the PRPD until later in the day. See id. ("If a person is arrested and held on a federal charge by 'any' law enforcement officer -- federal, state, or local -- that person is under 'arrest or other detention' for purposes of § 3501(c) and its 6-hour safe harbor period.").[16]

---

authorities were considering the possibility that he had murdered Lizardi. Agent Marrero acknowledged in her testimony at trial that she was asked to extend her shift on the night of August 1 so that she could interview Casey "at least in part based on [her] experience interviewing homicide suspects." Her superiors told her that Casey was being questioned because he was found in possession of a vehicle belonging to a missing undercover agent from the drug division.

[16] The timing of Casey's formal arrest by the FBI is not pertinent to the prompt presentment issue in this case because § 3501(c) covers "arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency." 18 U.S.C. § 3501(c) (emphasis added).

Put simply, the government has provided no support for its proposition that Casey remained a Commonwealth arrestee for purposes of § 3501(c) -- that he was "held only on state charges by state or local authorities," id. -- after jurisdiction over his case had shifted to federal authorities. Rather, the record reflects that the PRPD and FBI anticipated as of 6 AM on August 2 that only federal charges would be forthcoming. Although the FBI later obtained evidence to support the firearms and drug charges alleged in the complaint,[17] the clock at that point was already ticking. Delaying presentment beyond the safe-harbor period to continue building a case against a detained individual is directly at odds with McNabb-Mallory and the goal of ensuring that "'the issue of probable cause . . . be promptly determined.'" Galindo-Serrano, 925 F.3d at 46 (quoting Mallory, 354 U.S. at 454).

In sum, based on the facts presented by the government, we can only conclude that the FBI's responsibility for Casey's detention -- and the running of the prompt-presentment clock --

---

[17] The FBI's control of the case by the time Casey's grandparents' home was searched is confirmed by Agent Marrero's testimony at the suppression hearing, where she reported that she and other PRPD officers who went to the house merely secured the premises and then waited for the FBI to perform the search. More specifically, Marrero stated that, when she arrived at the house, she closed off the bedroom with tape and "then waited for the fellow officers from the FBI to arrive, and they took charge of everything else."

began at 6 AM on August 2.[18]   We therefore consider noon the endpoint of the six-hour safe-harbor period provided by § 3501(c). As described above, the comments Casey claims should have been suppressed were made between two and roughly four hours later.[19]

### (b) The Reasonableness of the Presentment Delay

In its brief, the government argues that, even if the clock started at 6 AM for purposes of § 3501(c), the two-hour delay that exceeded the safe-harbor period and preceded Casey's comments to Marrero was reasonable because "the priority for both the FBI and the PRPD was to find Lizardi alive."  In support of its view, the government invokes the district court's finding that the

---

[18] We recognize that Luis Moulier, the FBI case agent, gave testimony suggestive of a later timeframe for federal jurisdiction.  Moulier stated that he was given the case at about noon on August 2, and he said that "[a]t the beginning[,] . . . what I knew was that they had a person detained and then they explained to me what happened the day before, on the 1st, August 1.  From there on and in consultation with the [Assistant United States Attorney] we decided to assume jurisdiction in the case."  Moulier also stated, when asked when he had arrested Casey, that Casey "was placed under arrest on August 2."  Given other timing inconsistencies in the record, we adhere to the district court's finding (accepted by the government in its briefing) that jurisdiction shifted at 6 AM.  See Casey II, 530 F. Supp. 3d at 180.

[19] The district court appeared to assume that the relevant timeframe for assessing Casey's prompt presentment claim was the full thirty-six hours from Casey's arrest by the PRPD to his appearance before the magistrate judge.  We need not review that assumption because of our determination that the safe-harbor period expired at noon on August 2 -- at least two hours before Casey made the first set of challenged statements.

investigative actions taken by authorities throughout the day on August 2 had "legitimate law enforcement purposes," Casey II, 530 F. Supp. 3d at 188, and were "unrelated to any [effort at] prolonged interrogation." Id. (alteration in original) (quoting Boche-Perez, 755 F.3d at 336-37).

The government's argument fails, however, because the district court's rejection of Casey's claim of improper presentment delay was premised in substantial part on reasoning that is incompatible with McNabb-Mallory and § 3501(c). As we have described, delay beyond the six-hour safe-harbor period must be justified by administrative or other logistical factors that would make timely presentment infeasible. The district court instead deemed the delay in presentment reasonable throughout the morning and early afternoon of August 2 -- while Casey was detained in Canóvanas and Luquillo before being brought to Ceiba -- because the agents were engaged in "legitimate" law enforcement tasks, including the search of Casey's grandfather's home. Id. The court further stated that Marrero's "brief period of questioning" that afternoon -- i.e., after expiration of the safe-harbor period -- "served the primary purpose of ensuring public safety and [was] not an attempt at prolonging an interrogation to obtain a confession." Id. The court reached that conclusion "[d]ue to the gravity of the circumstances regarding Agent Lizardi's whereabouts and unknown physical condition." Id.

- 27 -

The district court's reasoning suggests that it believed any "legitimate law enforcement purpose[]" could extend the prompt-presentment clock regardless of the feasibility of simultaneously bringing Casey to a magistrate judge. The court noted the various measures identified by the Fifth Circuit in Boche-Perez as "permitted, within reasonable limits," to justify a delay in presentment, including "to investigate whether the crime occurred; search and secure a premises; and secure, confiscate, or destroy contraband." Casey II, 530 F. Supp. 3d at 187 (quoting Boche-Perez, 755 F.3d at 337). The district court also cited a Second Circuit decision holding that a presentment delay was "necessary when moving [an] arrestee through [the] complexities of [a] combined federal-state system." Id. at 188 (citing United States v. Collins, 462 F.2d 792, 796 (2d Cir. 1972)).

As our discussion in Galindo-Serrano makes clear, however, such "permitted" law enforcement activities do not justify delayed presentment unless they in fact impact law enforcement's ability to meet § 3501(c)'s timing requirement. We noted in Galindo-Serrano the absence of evidence showing that the FBI agents in that case were unable to accomplish their other objectives -- including assisting the PRPD in containing a possible riot -- while also timely bringing the defendant to the magistrate judge. See 925 F.3d at 49.

We have no doubt that the officers involved in the

investigation in this case were intensely and rightfully concerned about Lizardi's condition and wanted to do whatever they could to find him before it was too late. Likewise, the time spent by agents to search Casey's grandparents' home unquestionably was proper. But despite the limited scope of the exceptions to the six-hour safe-harbor period, the district court identified no practical considerations preventing the federal agents from meeting the prompt presentment requirement while also continuing to search for Lizardi and further investigate what happened. Nor does the government indicate any barriers to bringing Casey to a magistrate judge within the six-hour window. Notably, there was no "shortage of personnel." Jacques, 744 F.3d at 814. More than one hundred PRPD officers were involved in the ongoing search for Lizardi, and the lead FBI agent on the case reported that ten to fifteen agents from the federal agency's Fajardo area office, as well as agents from the San Juan office, also were involved. Although some officers were conducting the search of Casey's home, there is no explanation for why two or three agents could not have been spared to bring Casey to a judicial officer. See Galindo-Serrano, 925 F.3d at 48-49 (questioning a delay in presentment where "approximately[] seven to 10 people" were involved in an investigation and the record failed to show how many FBI agents were needed to secure a search warrant and help contain a riot); id. at 49 (quoting United States v. Perez, 733 F.2d 1026, 1035 (2d

Cir. 1984), where the court found "no 'shortage of manpower' because 'more than six agents were assigned to the case, and . . . one of them could have taken [the defendant] to the then available magistrate" (alteration in original)).

In addition, the safe-harbor period -- between 6 AM and noon on a Tuesday -- was largely during regular business hours, presumably making access to a judicial officer feasible. Plainly, transportation was not a problem. To the contrary, as described above, Casey was moved multiple times during his thirty-six hours of custody before his appearance before the magistrate judge.

The district court's finding that Marrero's questioning of Casey at Ceiba was permissible for public safety reasons is also seriously flawed. The court stated that "Marrero confronted [Casey] with the evidence found in his bedroom and pleaded with him to reveal Lizardi's whereabouts." Casey II, 530 F. Supp. 3d at 188. In other words, the court itself recognized that Marrero's purpose was to extract more information about the crime from Casey after the safe-harbor period had expired -- an objective directly at odds with the prompt presentment requirement. In these circumstances, excusing the post-noon delay in bringing Casey to the magistrate judge would plainly undermine the prophylactic deadline for presentment that is meant to stop such ongoing questioning of detainees and ensure that they are apprised of their rights by a judicial officer as soon as feasible.

The district court, and the government on appeal, appear to be suggesting that the presentment delay was simply an innocuous by-product of the unfolding investigation and that no McNabb-Mallory error occurred because the questioning beyond the safe-harbor period lacked "all the evil implications of secret interrogation." McNabb, 318 U.S. at 344. It is enough, however, if the delay was "of a nature to give opportunity for the extraction of a confession." Mallory, 354 U.S. at 455 (emphasis added). And, indeed, Casey's prolonged detention presented Agent Marrero with just such an opportunity to interrogate Casey a second time before he was apprised of his rights by the magistrate judge. It was only during that second interview -- at least eight hours after the FBI assumed jurisdiction -- that Marrero elicited the first set of inculpatory statements from Casey. Moreover, those statements came only after Casey was presented with the newly discovered, highly incriminating evidence from his bedroom.

Although the government undoubtedly is correct when it observes in its brief that the "more than 100 law enforcement officers looking for Lizardi . . . were not focused on Casey," that is not an acceptable justification for ignoring Casey's right to prompt presentment. Section 3501(c) "tolerates delays" that affect the ability of authorities to get an arrestee to a judicial officer on time, Boche-Perez, 755 F.3d at 337, but the statute's specific reference to issues related to "the means of

transportation and the distance to be traveled" cannot be broadened to generally include the ongoing investigative process itself, 18 U.S.C. § 3501(c).  See also Corley, 556 U.S. at 308-09 ("'It was clear' at common law 'that the only element bearing upon the reasonableness of delay was not such circumstances as the pressing need to conduct further investigation, but the arresting officer's ability, once the prisoner had been secured, to reach a magistrate.'" (quoting Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 61 (1991) (Scalia, J., dissenting))).  Courts have construed § 3501(c) pragmatically to allow flexibility for "legitimate" law enforcement activities, but the need for more time must be real. Here, none of the rationales offered by the government explain why, given the number of PRPD and FBI agents involved, Casey's presentment was necessarily and reasonably delayed.[20]

We thus think it beyond debate that Casey was improperly denied his right to prompt presentment.  Accordingly, we must consider whether the failure of Casey's attorneys to seek suppression based on the Rule 5 violation was so egregious that no competent attorney would have committed that mistake.  See, e.g.,

_____

[20] As noted above, the government stated at oral argument that the federal complaint depended on the discovery of the gun during the search of his room.  We have explained why the record does not demonstrate such a limitation.  Moreover, neither the district court in its opinion nor the government in its brief suggested that Casey was not brought to the magistrate judge sooner because federal authorities lacked probable cause to detain him for a federal crime until after they found the gun.

Watson, 37 F.4th at 28.

Before examining counsel's performance, however, we pause to note that the prompt presentment violation affects only Casey's first set of inculpatory statements -- the comments to Marrero. Even though Casey's overheard comments to his wife were made later in time than the comments to Marrero, they were not inadmissible, under either § 3501 or the McNabb-Mallory rule itself, based on the FBI's delay in bringing Casey to the magistrate judge. Section 3501(d) permits "the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone." 18 U.S.C. § 3501(d) (emphasis added); see, e.g., United States v. Colon, 835 F.2d 27, 30-31 (2d Cir. 1987) (holding that the defendant's incriminating statement was not excludible under § 3501 "even if the delay in arraignment was unreasonable" because the "statement was spontaneous and not the product of interrogation or its functional equivalent"). In our decision on Casey's direct appeal, we upheld the district court's finding that Casey's comments to his wife, although made in the presence of an FBI agent, did not involve interrogation. See Casey I, 825 F.3d at 21 (noting that "Casey offer[ed] no evidence that the FBI brought [his wife] in for interrogation purposes"); see also Arizona v. Mauro, 481 U.S. 520, 521, 530 (1987) (concluding that officers did not interrogate a suspect when they "allowed him to speak with his wife in the

presence of a police officer").  Section 3501 therefore does not "bar [their] admission in evidence."  18 U.S.C. § 3501(d).

Nor have we found a case in which a statement made spontaneously during a period of unnecessary delay was excluded under McNabb-Mallory.  As the Supreme Court has explained, the McNabb-Mallory doctrine was primarily designed "to check resort by officers to 'secret interrogation of persons accused of crime.'"  Corley, 556 U.S. at 308 (quoting Upshaw v. United States, 335 U.S. 410, 412 (1948)).  Consistent with that rationale, and as reflected in § 3501(d), a voluntary confession given in circumstances that do not implicate the concern about improper interrogation -- the circumstances that exist on the record before us with respect to Casey's statement to his wife -- is not excludable.

Accordingly, Casey's comments to his wife were properly admitted into evidence, and counsel's failure to seek their suppression based on Rule 5 and § 3501(c) could not have denied Casey the effective assistance of counsel.

### 2.  Defense Counsel's § 3501(c) Suppression Error

As we have noted, the relevant timing -- the shift to FBI jurisdiction (at 6 AM), Marrero's initiation of questioning in Ceiba (no earlier than 1:55 PM), and Casey's eventual presentment before the magistrate judge -- is essentially uncontested.  A reasonably competent criminal defense attorney would be aware of the prompt presentment requirement of Rule 5 and § 3501(c).  As

the Supreme Court has observed, the requirement is not "just some administrative nicety, but in fact the rule has always mattered in very practical ways and still does." Corley, 556 U.S. at 320; see also id. (noting that the prompt presentment requirement "stretches back to the common law, when it was 'one of the most important' protections 'against unlawful arrest'" (quoting McLaughlin, 500 U.S. at 60-61 (Scalia, J., dissenting))); id. at 321 (noting Justice Frankfurter's observation in McNabb that "[t]he history of liberty has largely been the history of observance of procedural safeguards," 318 U.S. at 347, and stating that "McNabb-Mallory is one of them"). The thirty-six hours that Casey was in custody post-arrest and pre-presentment would alert any competent attorney to a possible violation of that requirement.

Moreover, trial counsel plainly recognized the harm to Casey presented by the statements he made while in FBI custody in Ceiba and argued for their suppression on other grounds. See Casey I, 825 F.3d at 19-21. Indeed, it is not an overstatement to say that self-inculpatory comments can be the most consequential evidence offered against an accused. See Arizona v. Fulminante, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence.").

In its brief, the government suggests that Casey's attorneys made a "tactical decision[]" to bypass the prompt presentment violation as a ground for suppression, and it asserts

that we may not second-guess that choice with the advantage of hindsight. But the government offers no tactical reason for defense counsel to have forgone that rationale for excluding Casey's comments, particularly in a capital case. To the contrary, the undisputed timing gave the prompt presentment claim more potential than the claim that Casey had been assaulted when arrested. See Casey III, 2013 WL 12190563, at *7-8 (rejecting Casey's assault-based suppression claim after reviewing the evidence and questioning whether "any assault . . . actually took place"). Hence, the failure to pursue the prompt presentment issue suggests "inattention, not reasoned strategic judgment." Wiggins v. Smith, 539 U.S. 510, 526-27 (2003); see also Harrington v. Richter, 562 U.S. 86, 109 (2011) (observing that "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions" (quoting Wiggins, 539 U.S. at 526)).

Although we can conceive of no strategic reason to bypass a prompt presentment argument for suppression given the undisputed federal authority over Casey's case as of 6 AM on August 2, it is possible that defense counsel was unaware of the shift in jurisdiction at that time.[21] But such lack of knowledge would only

---

[21] Again, we note that the district court denied Casey's request for an evidentiary hearing on his habeas claims, and we have no explanation from trial counsel for the failure to rely on the prompt presentment violation.

reinforce the appearance of deficient performance. Casey's motion to suppress his statements on other grounds included the observation that "the FBI had been involved since the outset of this investigation," Motion to Suppress at 3 n.2, Casey III, 2013 WL 12190563 (No. 3:05-cr-00277-ADC) -- a fact that would have alerted any reasonable attorney to a potential McNabb-Mallory claim and the importance of probing the FBI's specific role and authority throughout the thirty-six hours of detention. Particularly because no Commonwealth criminal charges were filed against Casey, the details of the PRPD-FBI interaction warranted a close look to determine when the prompt presentment clock began to run. See United States v. Chadwick, 415 F.2d 167, 171 (10th Cir. 1969) ("Though the working arrangement [between state and federal authorities] be proper, the mere fact of state custody should not in and of itself excuse compliance with Rule 5(a). . . . Rule 5(a) should surely be honored, unless for some reason compliance is prevented by state custody."); see also Alvarez-Sanchez, 511 U.S. at 359 (describing the possibility of an improper state-federal collaboration); Strickland, 466 U.S. at 690 (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" (emphasis added)); id. at 691 (noting counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary");

United States v. Coppola, 281 F.2d 340, 344 (2d Cir. 1960) (en banc) (rejecting a Rule 5(a) claim where "the apprehension and detention were exclusively for state crimes"), aff'd, 365 U.S. 762 (per curiam).

To be sure, counsel's failure to rely on one basis for suppression while asserting others seems a less extreme instance of incompetence than other deficiencies that have supported successful Sixth Amendment claims. See, e.g., Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (involving "a complete lack of pretrial preparation"); United States v. Mercedes-De La Cruz, 787 F.3d 61, 66 (1st Cir. 2015) (involving counsel's failure to file any timely motion to suppress inculpatory post-arrest statements). Yet, on the facts of this case, where the government had no direct evidence that Casey was the shooter, the failure to invoke such an obvious rationale for excluding his comments is an inexcusable omission of considerable magnitude. See United States v. Miller, 911 F.3d 638, 641 (1st Cir. 2018) ("[W]hen an attorney fails to raise an important, obvious defense without any imaginable strategic or tactical reason for the omission, his performance falls below the standard of proficient representation that the Constitution demands." (internal quotation marks omitted) (quoting Prou v. United States, 199 F.3d 37, 48 (1st Cir. 1999))). The importance of the prompt presentment requirement and the accessibility of the facts needed to establish the violation

distinguish this case from those in which we have declined to second-guess a defense attorney's litigation choices. See Thompson, 64 F.4th at 423 ("Defense counsel could reasonably have concluded . . . that [defendant]'s interests were best served by keeping the court's attention on th[e] potentially stronger arguments."); Vargas-De Jesús v. United States, 813 F.3d 414, 418-19 (1st Cir. 2016) (describing the uncertain precedent and the risks of adverse consequences that made defense counsel's challenged strategy "a quite reasonable calculation of risk vs. reward").

In sum, because defense counsel plainly understood the prejudice inherent in Casey's comments to Marrero -- that Lizardi "was maybe alive or maybe he was dead" and that Casey was "sunk because of the evidence" -- and nonetheless neglected an obvious and viable rationale for suppressing them, we conclude that the failure to seek suppression of those comments based on the prompt presentment violation was representation that "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.[22] We thus turn to Strickland's prejudice prong.

---

[22] The fact that the district court rejected Casey's prompt presentment claim in disposing of his habeas petition does not diminish his attorneys' error in failing to seek suppression of the statements to Marrero. As we have explained, the district court erred as a matter of law when it found no McNabb-Mallory violation. Hence, if Casey's counsel had invoked that violation as a basis for suppressing Casey's comments, it would have been legal error to deny suppression.

**C. Did Counsel's Deficient Performance Prejudice Casey at Trial?**

We note at the outset that Casey's claim would be hopeless on the prejudice prong if the answer hinged on the evidence of his presence at the scene when Lizardi was murdered. As recounted above, the physical and testimonial evidence establishing that he was there was so overwhelming that the impact of any statements confirming his presence that should have been suppressed could only reasonably be described as minimal. But Casey's presence was not the evidentiary question before the jury. The convictions at issue were each premised on Casey's intent to seriously injure or kill Lizardi. And Casey's prejudice argument has some force in part because of the way the case was presented to the jury. First, although the government argued in its brief on appeal that the convictions would survive even if Casey was not the triggerman, the alternative theory the government offers -- liability as an aider and abettor -- is not viable on the record before us.[23] Second, as we shall describe, the government

_____

[23] As the government acknowledged at oral argument, it did not rely on an aiding and abetting theory at trial. To the contrary, the government asked the jury to find that Casey used the weapon found in his bedroom "to fire [the] projectile through the head of Officer Lizardi." And, at another point in its closing, the government told the jurors they needed to decide whether the government had proven "that Lashaun Casey did it. That is what this trial is about. No one else, nothing else." As we previously have observed, "we cannot affirm a criminal conviction on the basis of a theory not presented to the jury." United States v. Figueroa-

- 40 -

repeatedly invoked Casey's "confession" to Marrero when arguing to the jury that it had proven its case.[24]

Yet, Casey still faces a significant challenge in showing a "reasonable probability" that the government's use of the Marrero interview made the difference in the jury's finding of guilt. See Strickland, 466 U.S. at 693-94. Although Casey's improperly admitted observation to Marrero about his situation was more self-focused ("I am sunk with the evidence," as paraphrased by the government) than the properly admitted comment to his wife ("in the house they seized a lot of evidence but . . . they weren't

---

Cartagena, 612 F.3d 69, 76 (2010) (quoting Chiarella v. United States, 445 U.S. 222, 236 (1980)).

[24] As Casey points out, his inculpatory statements were technically not "confessions" because "they do not admit to the ultimate act of having killed Lizardi." See "Confession," https://thelawdictionary.org/confession/ [https://perma.cc/NLZ3-PQ8J] (captured April 24, 2024) ("In criminal law. A voluntary statement made by a person charged with the commission of a crime or misdemeanor, communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act or the share and participation which he had in it."). In that respect, Casey's situation resembles the observation by two researchers that, "[i]n the eyes of police and prosecutors, . . . a confession . . . encompass[es] any statements which tend to incriminate a suspect or a defendant in a crime." Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C. L. Rev. 891, 892 n.1 (2004); see also id. (noting that "statements placing a defendant at a crime scene are often treated as 'confessions'"). That broader notion of a confession is reflected in § 3501, which states that, "[a]s used in this section, the term 'confession'" includes "any self-incriminating statement made or given orally or in writing." 18 U.S.C. § 3501(e).

going to find the body"), the two comments overlap.  To Marrero, Casey admitted the obvious fact that the physical evidence was against him.  To his wife, he effectively reiterated that the evidence was damning while attempting to reassure her that, without the body, he would be absolved of criminal responsibility.[25]

This overlap is critical to the prejudice inquiry, which requires us to examine how the government used the Marrero testimony and Casey's comment to his wife, and to consider any other indicators of the impact of Casey's statement to Marrero on the jury's deliberations.  In making that assessment, we necessarily must speculate about how the jury would have responded to the government's case without the wrongly admitted statement. See, e.g., Rivera v. Thompson, 879 F.3d 7, 18-19 (1st Cir. 2018). We thus think it useful and important to review the prosecution and defense theories, including the extent to which the government relied specifically on the exchange between Casey and Marrero in its efforts to prove its case.

### 1.  The Criminal Charges and the Competing Theories of Casey's Role in the Carjacking and Murder

The district court instructed the jurors that, to find

---

[25] As recounted above, Casey was more evasive with Marrero about what happened to Lizardi, telling her only that the agent "was maybe alive or maybe he was dead."  Casey's admission to his wife that Lizardi was dead likely explains why the government highlighted that part of their conversation in its closing arguments.  See infra.

Casey guilty on Count I (carjacking), they needed to find that the government proved the following beyond a reasonable doubt: (1) that Casey knowingly took the vehicle from Lizardi, (2) that he did so by force and violence, (3) that the vehicle had traveled in interstate commerce, (4) that Casey "intended to cause death or serious bodily injury at the time he demanded or took the control of the motor vehicle," and (5) "that death resulted." For Count II (using a firearm during a crime of violence), the court told the jurors they had to find:

> First, that Lashaun Casey committed the crime of carjacking described in Count 1[;] Second, that Lashaun Casey . . . knowingly used, possessed, brandished, carried or discharged a firearm during and in relation to or in furtherance of the commission of that crime[;] Third, that Lashaun Casey knowingly, willfully, deliberately, maliciously or with premeditation caused the death of Jesus Lizardi Espada through the use of a firearm.

Because Casey effectively conceded that he was present when Lizardi was killed -- a scenario that was corroborated, among other evidence, by his possession of Lizardi's truck and the highly incriminating items found at his home -- the only contested elements at trial were intent and causation. In other words, Casey's guilt turned on whether he had the intent to harm Lizardi and whether he was the person who shot the agent while taking the truck from him.

The government's theory at trial was that Casey killed

Lizardi to steal the vehicle and the $3,600 in drug-buy money Lizardi was carrying.[26] However, despite Casey's undeniable presence at the crime scene, the government had no direct evidence to prove that he was in fact the shooter, such as gunpowder found on his person or clothing. Taking advantage of that gap, the defense sought to create reasonable doubt concerning Casey's role by suggesting that the actual shooter was more likely Hernández -- the individual from whom Lizardi planned to purchase drugs. The defense elicited testimony that Casey had interacted with Lizardi multiple times in the past and that Lizardi's supervisor, Agosto, felt that Lizardi was not in danger when he was with Casey. As described above, see supra Section I.B, the defense theory was that Casey merely helped Hernández cover up a murder Casey had not anticipated, and he therefore lacked the intent required to find him guilty of the crimes as charged.

The trial record thus includes not only the incontrovertible evidence of Casey's involvement in the carjacking and murder but also evidence designed to both raise and alleviate doubts about whether he was the sole actor. The prosecution and

---

[26] The money apparently was never found. The FBI's case agent, Moulier, testified at trial that he was "not aware" whether the money was found on Lizardi's person when his body was recovered. In an affidavit attached to the complaint filed on August 3, 2005, Moulier reported that $2,960 in cash was seized in the search of Casey's bedroom, but no link was drawn in the affidavit between that sum and the money Lizardi carried for the drug buy. Nor was any evidence about the seized cash introduced at trial.

defense each presented expert testimony on the direction of the bullets that struck Lizardi, as well as testimony on whether one person could have transported Lizardi's body to the location where it was found. The government, for example, attempted to show that Casey shot Lizardi from the front passenger seat of Lizardi's truck, while the defense attempted to show that Lizardi was likely hit from behind -- consistent with the defense suggestion that Hernández shot him from the back while Casey was sitting in the front. Similarly, the government elicited testimony suggesting that one person could have dragged Lizardi's body from room to room through a small building before pushing it out a window and down the hillside beyond the structure. A defense expert said two people likely were needed to move the body in those circumstances.

The prosecution and defense also sparred through witness testimony on the adequacy of the government's investigation, particularly concerning Hernández. As one example, defense counsel elicited testimony that no DNA testing was done on hairs recovered from a towel found in Lizardi's truck, even though other testing failed to associate the hairs with either Lizardi or Casey.[27] The government, for its part, adduced evidence that agents

---

[27] As defense counsel later acknowledged in her argument to the jury, the expert report that excluded Casey as the source of the hairs contained the caveat that the samples could have been affected by the passage of time.

had interviewed Hernández and searched his home, but found no credible evidence of his involvement in Lizardi's death.

Given the defense effort to create reasonable doubt that Casey acted alone, it is unsurprising that the government's closing and rebuttal arguments emphasized the overwhelming nature of the evidence against him and the lack of evidence that Hernández was the shooter. As we describe below, Casey's "sunk with the evidence" comment to Marrero also was a centerpiece of those arguments.

### 2. The Government's Closing Argument

In its initial argument to the jury, the government reviewed the evidence of Casey's interaction with Lizardi on the morning of August 1, 2005, as well as the evidence of Casey's presence at the scene of the murder. Responding to the defense's alternative-suspect theory, the prosecutor stated that "[t]here is no evidence at all that anyone else was ever in the vehicle except Officer Lizardi and the defendant." The government also pointed out that Casey did not name Hernández as the actual perpetrator at any time during his lengthy detention before he appeared before the magistrate judge.

---

Relatedly, the government asked the court to instruct the jury that it did not have a DNA sample from Hernández because it did not have probable cause to charge him and, hence, could not demand a sample. The court did not immediately rule on the request, and, though we found no explicit denial in the record, it appears the court decided against giving such an instruction.

Asserting that "[t]he government has proven this case beyond a reasonable doubt," the prosecutor suggested that the government had done so in part based on Casey's "confession":

> We have given you the murder weapon, the projectile, we have him driving the vehicle, we have Officer Lizardi's blood on the money, on his clothes. Officer Lizardi's cellphone in his house. We have his confession, his confession to Diana Marrero when confronted with the evidence he says I am sunk with the evidence. He could not say it was not me. He does not say it was Alexander [Hernández]. He says I am sunk with the evidence. He admits it right then and there. And later on when he is talking to his wife the mother of his child what does he say? They have a lot of evidence but they haven't found the body.

Shortly thereafter, suggesting that the prosecution could not have produced "any stronger" evidence to prove that Casey was the killer, the government again referred to both his statement to Marrero and his comment to his wife:

> What other evidence could there possibly be aside from maybe a video that we could present to you to prove this case any stronger? He confessed, "I am sunk with the evidence." They haven't found the body. He used that weapon, he brandished that weapon, he pulled the trigger and sent that projectile through the head of Officer Lizardi.

The government's closing also deflected the defense's critique of the investigation and the suggestion that authorities had failed to seriously pursue Hernández as a suspect. Emphasizing that the case had been solved in only nine days, the government recounted the events of the first three days as follows: "Officer

Lizardi was murdered on August 1, August 2 the defendant is arrested[;] the same day, August 2 he confesses." The prosecutor went on to describe the discovery of the various items of physical evidence and the recovery of Lizardi's body during the nine-day period, and he advised the jurors "to decide the case on the evidence presented . . . [n]ot conjecture."

Near the conclusion of the closing argument, the prosecutor urged the jurors to listen to what the defense would say in its own closing about why Casey possessed the murder weapon and was driving Lizardi's bloodstained vehicle. He then urged them to "Listen as they try to explain the confession to Diana Marrero. Listen as they try to explain the confession to the wife, they haven't found the body. Listen to whether or not they can explain all that and decide whether or not that explanation is reasonable."

### 3. The Defense Closing Argument

As the prosecutor's argument had anticipated, the defense's closing emphasized the government's "tunnel vision" in prosecuting the case and particularly the failure to pursue leads that could have proven Hernández's involvement. Near the outset of her argument, defense counsel recounted the evidence indicating that Casey and Lizardi had planned a drug deal with Hernández for August 1, and she asserted that "[t]here is no doubt that a person by the name of Alexander [Hernández's first name] had dealings

with Mr. Lizardi."  Counsel emphasized the failure to do a DNA analysis of the hairs recovered from Lizardi's truck, and she suggested that the hairs were visually more consistent with Hernández's appearance -- as shown to the jury by means of a photograph -- than with Casey's physical makeup.  The defense argument also highlighted the absence of direct evidence that Casey was the shooter: "Was there any evidence that fingerprints were lifted from the weapon?  Any evidence that fingerprints were lifted from the magazine?  Any evidence that fingerprints were lifted from the bullets?  Was there any evidence that Mr. Casey was tested for gunpowder?"

Counsel cited the expert opinions favorable to the defense view that two people were involved in the crime, and she noted that the money Lizardi had been carrying for the drug deal was missing.  She further emphasized that the evidence offered by the government -- including the bloody sandals and murder weapon found in Casey's bedroom -- showed only that Casey was connected to the crime, not that "he is the one that fired the shots."  The defense closing argument did not refer to Casey's comments to Marrero and his wife.

In summing up, counsel argued that the government's evidence fell short of proving beyond a reasonable doubt that Casey did the shooting or intended to kill Lizardi at the time he took control of Lizardi's vehicle.  In part, she said:

The government must prove beyond a reasonable doubt that Mr. Casey committed a carjacking with the intent to kill Mr. Lizardi. There was no evidence during trial that Mr. Casey knew that Mr. Lizardi was an undercover cop. No evidence to prove that Mr. Casey planned or premeditated to kill Mr. Lizardi. . . . [T]he evidence suggests that when he left his house that morning . . . he had no idea that Mr. Lizardi was going to die. There is no evidence to infer that Mr. Casey was carrying a weapon when he was picked up by Mr. Lizardi that morning. And the evidence shows he was in the truck with Mr. Lizardi. There is evidence to infer there was more th[a]n one participant. Just because Mr. Casey was there, which is the government theory, does not mean he was the one who shot.

### 4.  The Government's Rebuttal Argument

Near the beginning of the government's response to the defense argument, the prosecutor again highlighted Casey's "confessions," emphasizing that the defense could not square its alternative-suspect theory with Casey's statements to Marrero and his wife:

> They didn't touch his confession. They didn't explain to you why he would tell Diana Marrero I am sunk with the evidence. They don't touch the statement he said to his wife they haven't found the body. They just come in here and said [the expert witness] said it was an intruder in the backseat.

In attempting to discredit the defense theory, the government referred to "[t]his magic killer that appears out of thin air and shoots him in the head and leaves [Casey] with all of the evidence."  The government criticized "this theory of another

shooter" as newly developed.

The government also responded again to the accusation that law enforcement had investigated the crime with "tunnel vision" and again relied, in part, on Casey's "confession":

> Trained law enforcement agents who do this for a living[] investigated Alexander Hernandez and there is no evidence. Contrast that with the defendant. He gets interviewed and confesses. His grandparents get interviewed. They search the house. They have a confession, all the evidence[.] . . . So, same investigation two different people, the only problem is all of the evidence is against Lashaun Casey.

The government's rebuttal also included a lengthy critique of the defense's expert opinion on the direction of the shots that killed Lizardi. Near the end of the rebuttal, the government gave particular attention to Casey's statement to Marrero:

> We can investigate this case for ten years, what else are we going to find? What other evidence exists out there. If we have the murder weapon, his confession, let's talk about that confession. Now that we have shown that the [defense expert's] testimony is all over the place. We have shown there is no shooter in the backseat so let's go to his confession. When he is confronted on August 2, 2005 by Agent Marrero, the only evidence, the only evidence that the FBI had collected at that moment were the cellphone of Officer Lizardi and the truck that he was caught driving.[28] Everything else that we found was

---

[28] It appears that, in describing the truck and the cellphone as "the only evidence," the prosecutor was relying on his prior and subsequent references to the gun to complete his assertion about the "[t]hree pieces of evidence." Although other items also were seized at Casey's home, the prosecutor was likely highlighting

found after he made the statement. Three pieces of evidence. The police don't even know that that gun is the murder weapon because they don't test it until when? Seven days later, which means at the time that he said I am sunk with the evidence he is the only person who knows the gun they found is the murder weapon. And he confesses. We haven't tested the money, or the gun yet, we haven't talked to the parking lot attendant, we haven't found the window, and he is confessing with three pieces of evidence, one of which he knows is the murder weapon. That is a confession of a guilty killer.

In total, throughout its initial and rebuttal closing arguments, the government used the word "confession" or a derivative ("confessing," "confessed") sixteen times. Nine of the sixteen uses of confession terminology -- including all six uses near the end of the government's rebuttal -- either specifically invoked the interview with Marrero or relied more generally on his "confession" without any reference to his comment to his wife. Whenever the government invoked both of Casey's challenged statements, it referred first to the "confession" to Marrero and secondarily noted his comment to his wife. On other occasions, the government mentioned only the comment to Marrero or referred more generally to his "confession" without specification.

### 5. The Likelihood of Prejudice

The overwhelming evidence of Casey's presence when

---

the evidence he considered most significant at the time of the Marrero interrogation.

Lizardi was shot is plainly a significant factor in assessing whether there is a "reasonable probability" that the jury would have found him not guilty if his statement to Marrero had not been erroneously admitted.  Strickland, 466 U.S. at 694.  Nonetheless, as we have described, the absence of direct evidence that Casey shot Lizardi left open the possibility of a shooter other than Casey.

The record belies any notion that the evidence of Casey's involvement alone was decisive in the jury's finding of guilt on Counts 1 and 2.  After deliberating for roughly four hours, beginning at 1:15 PM, the jurors asked for "a copy of the transcript relating to the testimony of Agent[] Diana Marrero." Shortly thereafter, Marrero's testimony was read to the jury.  The jurors then continued deliberating and, at about 7 PM, advised the court that they wanted to resume deliberations the next day.  The jury was then excused until 9 AM.  It was not until 12:25 PM the following day that the jurors reported reaching a unanimous verdict.  Although we do not know specifically what prompted the jurors to ask to review Agent Marrero's testimony,[29] it is a fair inference that they viewed Marrero's testimony as important to

---

[29] That testimony was wide-ranging.  In addition to recounting the comments by Casey at issue here, Marrero described her initial interview with Casey, the investigation of his fabricated shootout story, the interview with his grandfather, and her visual search of Casey's bedroom.

their deliberations.[30]   Cf., e.g., Rivera, 879 F.3d at 18-19 (finding prejudice based on improper admission of statements obtained in violation of the Miranda rules where, even with those statements, the jury had difficulty deciding issues related to the charged crime, including the defendant's specific intent).

Moreover, our summary of the government's closing arguments shows that Marrero's improperly admitted testimony played a more prominent role in the government's efforts to eliminate doubts about Casey's guilt than did Casey's properly admitted comments to his wife.  The government's closing and rebuttal arguments more frequently referred to Casey's "sunk with the evidence" comment to Marrero as a "confession," and, as we have described, the government more frequently referenced that comment when relying on the "fact" that Casey had admitted guilt.

Thus, as noted above, Casey's claim that the prompt presentment violation impacted his trial has some force. Ultimately, however, we fail to see a reasonable probability that exclusion of the challenged "sunk with the evidence" portion of

---

[30] The jury also had posed questions to the court earlier, after the government completed its presentation of evidence.  At that time, they submitted notes asking for "a true definition of what the court meant as: 'Beyond Reasonable Doubt'" and whether "the presumption of innocence goes above the reasonable doubt." In response, the court summarized both principles, reminded the jurors that "evidence is still being presented," and told them they would "be receiving further instructions on all of these matters."

Marrero's testimony would have changed the jury's calculus in evaluating Casey's guilt.

The prosecutor on multiple occasions invoked both inculpatory comments when asserting in closing arguments that Casey had confessed. As recounted above, the government supported its declaration that "[w]e have his confession" by first quoting the "sunk with the evidence" statement and then quoting Casey's report to his wife that "[t]hey have a lot of evidence but they haven't found the body." Shortly thereafter, the prosecutor reiterated: "He confessed, 'I am sunk with the evidence.' They haven't found the body." The government urged the jurors in its initial argument to "[l]isten" to the defense explanations for both comments and pointed out in rebuttal that neither statement had been explained.

The government thus repeatedly drew both comments to the jury's attention as elements of Casey's "confession," and it insinuated that each statement was a separate admission of guilt. Although the government more frequently emphasized the "sunk with the evidence" comment to Marrero, the equivalent acknowledgment to his wife that the authorities had "a lot of evidence" against him reduces the likelihood that the jury's verdict depended on the statement to Marrero.

Moreover, the portion of Casey's conversation with his wife that was highlighted by the government -- "they haven't found

the body" -- was particularly damaging. While the government emphasized in its closing that Casey "could not say it was not me" when he was confronted by Marrero, he did not deny even to his wife that he committed the murder -- as one would expect from an innocent person to a loved one -- but he instead acknowledged that Casey was dead and focused on whether the authorities had enough evidence against him. The more telling context of an exchange between husband and wife, and the content of that exchange, thus significantly offset the government's greater emphasis on Marrero's testimony, further reducing the probability that Casey's comment to Marrero was decisive for the jury in finding that Casey was guilty as charged.

More likely, the jury rejected Casey's alternative-suspect defense because of the overall strength of the evidence against him and the complete absence of evidence placing Hernández at the crime scene. The prosecutor's closing arguments repeatedly targeted Casey's failure to identify Hernández as the shooter when he was arrested and reminded the jurors that, in contrast to the late-arriving theory that Hernández was the primary actor, Casey had initially told Marrero the fabricated story about a shootout. The government also heavily, and properly, contrasted the substantial evidence of Casey's involvement in the crime with the absence of evidence that anyone else was involved.

Indeed, the physical evidence against him was damning.

He had Lizardi's truck in his possession and the murder weapon (among other items) was found in his bedroom. At the same time, the defense's efforts to introduce doubt into the factfinding depended primarily on circumstantial evidence -- such as Lizardi's uneventful earlier interactions with Casey -- and the government's failure to produce other evidence -- such as DNA testing of the hairs found in Lizardi's truck. The defense expert who opined on the direction of the bullets and the movement of Lizardi's body was challenged on cross-examination and matched by the testimony of the government's own witnesses suggesting that Lizardi was shot from the passenger seat and that one person could have disposed of his body. The defense claim of a flawed investigation was met with the government's insistence that no evidence resulted from law enforcement's questioning of Hernández and a search of his home.

In sum, the similarity between Casey's two "confession" comments diminishes the likelihood that the jurors' deliberations would have concluded differently if they had heard only the comments Casey made to his wife. Moreover, the overall strength of the government's case, and the weaknesses in Casey's alternative-suspect theory, further reduce the probability that exclusion of the Marrero statement would have changed the jury's judgment on Casey's guilt.

Put simply, the likelihood that the error here affected

the jury's decision-making is not "sufficient to undermine [our] confidence in the outcome" of the trial. González-Soberal, 244 F.3d at 278 (quoting Strickland, 466 U.S. at 694). Accordingly, we conclude that Casey has not shown a "reasonable probability" that the jury would have reached a different verdict if counsel had successfully moved to suppress the comments to Marrero based on Rule 5(a) and § 3501(c). Strickland, 466 U.S. at 694. We therefore affirm the judgment of the district court denying Casey's petition for habeas relief.

So ordered.