# United States Court of Appeals
## For the First Circuit

No. 19-1485

ELVIN TORRES-ESTRADA,

Petitioner, Appellant,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lipez, Thompson, and Kayatta, Circuit Judges.

Ezekiel E. Cortez for petitioner-appellant.

Julia M. Meconiates, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for respondent-appellee.

December 6, 2024

**LIPEZ, Circuit Judge.** In this collateral criminal appeal, we consider an ineffective assistance of counsel claim brought by a defendant who relied on the plea-bargaining advice of one of his attorneys despite warnings from his other attorneys against accepting that advice. Appellant Elvin Torres-Estrada maintains that the bad advice -- along with that same attorney's obstruction of plea negotiations -- entitles him to resentencing under the principles of Missouri v. Frye, 566 U.S. 134 (2012), and Lafler v. Cooper, 566 U.S. 156 (2012).

More specifically, Torres-Estrada claims that, but for the ineffective assistance of his local counsel, he would have had a more favorable plea agreement and sentencing outcome: a likely term of 188 months' imprisonment instead of 288 months. He therefore argues that he is entitled to resentencing according to the terms originally proposed by the government. We disagree, concluding that his local attorney's representation was not constitutionally deficient and that Torres-Estrada's own decision-making drove the outcome of his plea-bargaining process. We therefore affirm the district court's denial of sentencing relief.

**I.**

**A. Overview**

In April 2010, Torres-Estrada and sixty-four other individuals were charged in a superseding indictment with, inter alia, conspiring to distribute large amounts of controlled

substances near a public housing project from roughly 1995 to 2009.[1] As described in detail below, plea negotiations initiated by Torres-Estrada's attorneys stretched into the fall of 2010. Then, in February 2011 -- with no plea bargain relating to the earlier indictment yet in place -- Torres-Estrada and three others were charged in a separate, single-count indictment with conspiring to import controlled substances into the United States.[2] On the eve of trial on the initial charges, in March 2011, Torres-Estrada signed a consolidated plea agreement in which he agreed to plead guilty to one count of each indictment. The agreement specified that Torres-Estrada could request a sentence of 264 months (twenty-two years), while the government was permitted to argue for a 288-month (twenty-four-year) term of imprisonment. As

---

[1] The original indictment was filed in September 2009, and Torres-Estrada remained a fugitive until June 2010. See United States v. Torres-Estrada, 817 F.3d 376, 377 (1st Cir. 2016). Torres-Estrada was charged in seven of the superseding indictment's eleven counts. Count One charged the conspiracy to possess with intent to distribute controlled substances near a public housing project. Counts Three through Six charged him with possession with intent to distribute various drugs: heroin (Count Three), crack cocaine (Count Four), cocaine (Count Five), and marijuana (Count Six). He was charged in Counts Seven and Eleven with conspiring to commit money laundering.

[2] A superseding indictment filed in the second case in September 2013 charged twenty-seven additional defendants with conspiring to import, and to possess with the intent to distribute, controlled substances. The superseding indictment also charged those individuals with conspiracy to commit money laundering and international money laundering.

noted above, the district court imposed the higher of those two possibilities.[3]

Following an unsuccessful direct appeal, Torres-Estrada filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, raising the ineffective assistance of counsel claim that is at issue in this appeal,[4] among other rationales for vacating his convictions and sentence. The district court rejected all grounds for relief. See Torres-Estrada v. United States, Civ. No. 17-1373, 2019 WL 1878294, at *8 (D.P.R. Apr. 26, 2019). We granted a certificate of appealability solely on the question of whether Torres-Estrada received ineffective assistance from his local counsel "in relation to plea-bargain negotiations with the United States." We therefore set forth below only the facts relevant to that issue,[5] drawing primarily from the affirmations filed by Torres-Estrada and one of his attorneys in the district

---

[3] The court sentenced Torres-Estrada to the 288-month term on the first indictment and imposed a concurrent 120-month term for the importation conspiracy. See Torres-Estrada, 817 F.3d at 378.

[4] Although Torres-Estrada pressed his ineffective assistance of counsel claim in his direct appeal, we did not address the issue there. See 817 F.3d at 378-79.

[5] Torres-Estrada includes in his brief an argument based on attorney conflict-of-interest. That issue is not only outside the scope of this appeal but also was disposed of during Torres-Estrada's direct appeal. See 817 F.3d at 378 n.2. We therefore do not address it.

court.[6]  The facts are largely undisputed; the debate concerns their legal significance.

**B. The First Indictment and Early Plea-Bargaining Process**

Following Torres-Estrada's arrest in June 2010 on the charges alleged in the first indictment, New York attorneys Raymond Granger and Edward Sapone appeared pro hac vice on his behalf at a bail hearing, along with a local counsel who later withdrew from the case.  Shortly thereafter, Ramón Garcia Garcia ("Garcia"), also a local Puerto Rico attorney, filed a notice of appearance to join the defense team.  According to Torres-Estrada, Garcia, who had been his attorney for an unrelated Commonwealth criminal matter, had asked to join the defense in the federal case as local counsel.

Early in their representation, Granger and Sapone concluded that Torres-Estrada might benefit from a joint plea deal with one of his co-defendants, Samuel Negron-Hernandez.  With their client's agreement, the two attorneys began coordinating with Negron-Hernandez's attorneys, Rafael Castro-Lang and Steven Potolsky.  Through that collaboration, and from meetings with the lead prosecutor, Granger and Sapone learned that the government

---

[6] An "affirmation" given in the context of legal proceedings is defined as "[a] solemn or formal declaration or asseveration . . . that the witness will tell the truth, . . . this being substituted for an oath in certain cases."  The L. Dictionary, "Affirm Definition & Legal Meaning," https://thelawdictionary.org/affirm [https://perma.cc/F67U-PTJ7].

had refused a proposed eleven-year term of imprisonment for Negron-Hernandez and would be seeking a sentencing recommendation for Torres-Estrada roughly two years longer than Negron-Hernandez's based on the government's view of their relative culpability. Garcia did not attend most of these meetings, consistent with his limited role as local counsel.

On September 20, 2010, via email, the government offered Torres-Estrada a plea deal that allowed him to request a 188-month sentence (fifteen years/eight months), while the government would argue for a sentence up to 210 months (seventeen years/six months). In his affirmation, Granger stated that the prosecutor, Assistant United States Attorney ("AUSA") Timothy Henwood, made two representations about the proposed plea deal that were not included in the email: (1) the government would not strongly argue for the higher sentence, with the expectation that the district court would accept the defense recommendation based on its "track record of honoring plea agreements," and (2) the government would not prosecute Torres-Estrada on additional charges. At about the same time, Negron-Hernandez was offered a deal allowing him to argue for a sentence of 168 months (fourteen years).

On September 22, two days after receiving the government's plea offer, Granger and Sapone met with one of Negron-Hernandez's attorneys, Castro-Lang, to discuss how to respond. The attorneys concluded that counteroffers would be

appropriate since Henwood had not said that the government's offers were final. They settled on a joint counteroffer of twelve years (144 months) for Negron-Hernandez and fourteen years (168 months) for Torres-Estrada -- consistent with the understanding that the government wanted a two-year differential between the two defendants and the government's rejection of Negron-Hernandez's earlier proposal for an eleven-year sentence. The attorneys further "reasoned that, even though the government might reject [those counteroffers, they] would be considered reasonable and might induce the government at least to lower the offers it had just made."

Garcia also attended this meeting, having been invited "as a matter of courtesy." Granger recounted that, at some point during the strategy discussion, "Mr. Garcia suddenly interjected that he was going to recommend to Mr. Torres-Estrada that the [counteroffer] for him should be 13 years (156 months)," rather than fourteen years (168 months). When Castro-Lang pointed out that such a counteroffer was inconsistent with the government's demand for a two-year spread between the two defendants, Garcia responded that he "did not care about" Negron-Hernandez. Granger pushed back, noting that the government's offers were premised on both defendants pleading guilty and that Torres-Estrada had benefited from the sharing of information between the two sets of attorneys. When the meeting ended, the four attorneys, as well as

Potolsky, headed to MDC Guaynabo to speak jointly with their clients.

At that client meeting, the lead attorneys discussed the government's plea offers and explained "why [they] believed them to be excellent offers that should be given serious consideration." The attorneys also explained why they nevertheless believed counteroffers were appropriate, the basis for the specific counteroffers they were proposing, and why they felt it was important to reach a plea deal soon. Among other factors, they cited the need for a two-year differential in the proposed sentences; AUSA Henwood's insistence on guilty pleas before the first trial in the case, which was then scheduled for late October 2010; and the risk that "delaying too long could result not just in the offer being withdrawn by the government but also in new charges being lodged against them based on new information." In emphasizing the need to act promptly, the attorneys also pointed out that "another defendant viewed [as] less culpable by the government might reach a plea bargain with the government in the meantime that potentially could raise the minimum sentence[s] that the government would insist upon for" Torres-Estrada and Negron-Hernandez.

According to Granger, by the end of the meeting, all five attorneys -- including Garcia -- agreed that the counteroffers should be fourteen years' (168 months') imprisonment for

Torres-Estrada and twelve years (144 months) for Negron-Hernandez. Granger stated that the two defendants also were advised that the attorneys "considered these to be the lowest [counteroffers] the government would consider credible in light of the prior plea negotiations and of offers made to other defendants in the case." Torres-Estrada and Negron-Hernandez endorsed the proposed counteroffer strategy. Garcia did not bring up at this meeting the thirteen-year counteroffer he had earlier announced that he would recommend to Torres-Estrada.

However, Garcia met separately with Torres-Estrada several times, including after the September 22, 2010 meeting, and gave him advice at odds with the lead attorneys' positive assessment of the government's offer, explaining that "he knew better" than the New York-based lawyers about the plea-bargaining possibilities because "his entire legal career had been spent in Puerto Rico." According to Torres-Estrada in his affirmation, Garcia told him that drug suppliers in Puerto Rico typically receive sentences between eight and twelve years in length, and Garcia expressed confidence that "he could obtain a plea agreement in that range" for Torres-Estrada. At one point, Garcia advised Torres-Estrada that he should not agree to a counteroffer of more than thirteen years (156 months) "because he [Garcia] did not believe the government had enough evidence to justify a sentence longer than that." Garcia also told Torres-Estrada that any

pre-trial plea offer from the government would remain available after the trial of the first group of defendants -- which at that time did not include Torres-Estrada -- and Garcia also suggested that he might be able to negotiate a better deal for Torres-Estrada after that initial trial.

When Torres-Estrada told Granger and Sapone about Garcia's assertions, they responded that "Mr. Garcia was simply wrong and was giving him very bad advice." They explained, among other disagreements with Garcia, that plea deals in previous drug-conspiracy cases in Puerto Rico "did not provide an accurate measure of what constituted a realistic plea bargain" for him because his case "involve[d] volumes of narcotics significantly higher than those in prior cases in Puerto Rico."

Meanwhile, after the September 22 attorney-client meeting at MDC Guaynabo, Granger arranged for the four lead attorneys to meet with AUSA Henwood on September 28.

## C. The Plea-Bargaining Events of September 27 and 28, 2010

On September 27, the day before the scheduled meeting with Henwood, Granger received the following email from Garcia:

> Good morning Ray:
>
> Yesterday I met with Elvin [Torres-Estrada] and he informed me that the [counteroffer] has to be 13 years, he will not authorize a [counteroffer] of 14 years.
>
> Have a nice day

Ramon

As set forth in his affirmation, Granger responded to Garcia at length. Among other criticisms, he chastised Garcia for discussing "pivotal issues" with Torres-Estrada without consulting the lead attorneys, asserted that Garcia was undermining the other attorneys "to the [] client's detriment," and had "raised [Torres-Estrada]'s expectations to unrealistic levels." Granger reminded Garcia that the government had rejected Negron-Hernandez's eleven-year proposed sentence and "ha[d] insisted on approximately a two-year spread between" the two defendants. Granger also pointed out that Garcia had agreed with the other lawyers' strategy during the session at MDC Guaynabo, and he asserted that Garcia should have advised Torres-Estrada not to make "such an important decision" -- i.e., changing the proposed counteroffer -- "without first conferring with all the attorneys involved and with [Negron-Hernandez]."

The next morning, before meeting with AUSA Henwood, Granger and Sapone went to MDC Guaynabo to discuss Garcia's email with Torres-Estrada. They told him that it was "inappropriate" for Garcia to advise him to change the agreed-upon counteroffer "not only because it was beyond his role as local counsel" but also because "no changes in strategy should be made without first consulting [Negron-Hernandez's] attorneys." They pointed out that it was "extraordinarily irresponsible for Mr. Garcia to upset the

- 11 -

joint-defense planning at the last minute." The attorneys also told Torres-Estrada that they "had observed a deterioration in his emotional and mental state" in recent weeks and that, in their view, "Mr. Garcia was capitalizing on his weakened condition and manipulating him."[7] They again explained the basis for the twelve- and fourteen-year counteroffers and told Torres-Estrada that a thirteen-year counteroffer "would be a fundamental, and likely disastrous, mistake." They reiterated that "time was of the essence" and that Garcia's suggestion that the government's same plea offer would remain available after the first trial "made no sense and, in any event, was contrary to AUSA Henwood's explicit warning" that the offer would not extend beyond the first trial.

After this discussion, Torres-Estrada authorized the lead attorneys to make a counteroffer of thirteen years/eight months (164 months), with Granger recalling that he "appeared confused and to struggle with his decision." Although Granger recommended against including Garcia in the meeting with Henwood later that day, Torres-Estrada said he wanted all three of his

---

[7] In his affirmation, Torres-Estrada reported that his attorneys had expressed this concern, but he did not state that he had in fact felt manipulated by Garcia. Rather, he said that he was "confused and nervous" when Garcia told him that he should not authorize a counteroffer of more than thirteen years' imprisonment shortly after the lead attorneys had secured his agreement to the fourteen-year counteroffer. He reported that he was "unsure what to do" and ultimately deferred to Garcia, "notwithstanding [his] doubts," after Garcia "persisted."

lawyers present. Granger therefore notified Garcia to meet the others at the U.S. Attorney's office in San Juan. While the attorneys were gathered in the reception area, Granger and Sapone told Garcia that Torres-Estrada had agreed to a thirteen-year/eight-month counteroffer during their meeting with him earlier in the day. Shortly thereafter, the attorneys entered the conference room for the meeting with Henwood.

In the meeting, Castro-Lang first argued for a lower plea offer for Negron-Hernandez and proposed the twelve-year (144-month) term. Henwood responded that the offer was "reasonable." Granger then spoke on behalf of Torres-Estrada, explaining that Sapone would add comments and then present their counteroffer. As Granger was turning to Sapone for his remarks, however, Garcia interrupted and told Henwood that Torres-Estrada's counteroffer was thirteen years (156 months). When Henwood immediately rejected that offer, Garcia asked if he would consider thirteen years/six months (162 months). Henwood said he would think about it, and Garcia then left. The meeting ended a short time later. Granger's affirmation does not report any comments by Henwood after Garcia's departure.

Following the meeting, Granger returned to MDC Guaynabo and told Torres-Estrada "the meeting had not gone well." In describing what happened, Granger said that, because Henwood had characterized the twelve-year (144 months) offer for

- 13 -

Negron-Hernandez as reasonable, he and Sapone believed the prosecutor also would have considered reasonable a fourteen-year (168-month) counteroffer for Torres-Estrada -- "and possibly even one of 13 years and 8 months" (164 months) -- and that such an offer "would not have spoiled the negotiating atmosphere." Granger again told Torres-Estrada that he "felt Mr. Garcia was manipulating him at a time when his emotional and mental state had been deteriorating." Granger said he planned to meet with Garcia the next day, and Torres-Estrada agreed that he should.

**D. The Plea-Bargaining Events Following the September 28 Meeting**

As he left the meeting with AUSA Henwood, Garcia indicated that he would be available to meet with Granger the next day. Nonetheless, Garcia refused to do so. Granger also learned that morning -- i.e., on September 29, 2010 -- that the government would not lower the plea offers. After conferring with Sapone and Negron-Hernandez's attorneys, Granger sent an email to Henwood explaining that Garcia's interjected thirteen-year counteroffer was unauthorized by their client and that he and Sapone were "furious" when Garcia intervened in the discussion. Granger reported that even Garcia's follow-up counteroffer of thirteen years/six months (162 months) was lower than Torres-Estrada had authorized (a counteroffer of 164 months). The email, sent on

- 14 -

September 30, included the following assessment of the meeting and request to continue negotiations:

> My sense, particularly after your having described [Castro-Lang]'s [counteroffer] as "reasonable," is that the counters made by Garcia were viewed as so unreasonable that they spoiled the negotiating atmosphere, resulting in your supervisors becoming so annoyed that they refused to authorize any movement by your side even if they otherwise might have considered it. . . .

> The bottom line is that Ed [Sapone], Rafael [Castro-Lang], Steve [Potolsky], and I believe a deal is still possible and would appreciate a chance to discuss that possibility. Do you have a few minutes later today or tomorrow to talk?

In his affirmation, Granger reported that he "continued to communicate with AUSA Henwood in early October 2010 in an effort to get the government to reconsider its position." Meanwhile, Granger learned that Garcia also was attempting to meet with the government. On October 8, Granger sent Garcia a letter telling him to stop such efforts. Granger told Garcia that Torres-Estrada had authorized Sapone and him to continue the negotiations, and Granger informed Garcia that Henwood had agreed to "discuss with his supervisor whether to reconsider the government's present position." The letter to Garcia concluded with the following paragraph:

> As Mr. Torres-Estrada knows, I have explained to AUSA Henwood that you spoke out of turn and inconsistent with Mr. Torres-Estrada's instructions at the meeting

- 15 -

held on September 28. It is on that basis that AUSA Henwood agreed to revisit the issue of whether the government would be willing to lower its offers to both Mr. Torres-Estrada and Samuel Negron-Hernandez. . . . After I had spoken with AUSA Henwood earlier this week, Mr. Torres-Estrada advised me that he wanted to hear the government's response, which AUSA Henwood believes he will be in a position to convey later today. Accordingly, any further efforts by you to negotiate with the government would be contrary to our instructions, but would also, in any event, make little sense.

Roughly a week later, on October 14, AUSA Henwood, apparently having consulted with his supervisor, confirmed to Granger that the original offer to Torres-Estrada -- fifteen years/eight months (188 months) -- would not be reduced.[8] Torres-Estrada was informed of the government's position, stating in his affirmation that he learned "[i]n early October 2010 . . . that the government had refused to lower its original plea offer of 188 months' (15 years, eight months') imprisonment and that it was the government's final offer." According to Torres-Estrada, Garcia nonetheless continued to advise him "in one or more meetings at MDC Guaynabo not to believe that that was the government's final offer, and that he [Garcia] would be able to

---

[8] We note that, in describing the various offers under discussion, we refer generally to the sentencing recommendation that would be made by Torres-Estrada rather than the higher recommendation that the government would be authorized to make. As recounted above, both parties anticipated that the district court would adopt each defendant's recommendation. See supra Section I.B.

obtain a better deal than that from the government." Garcia also told Torres-Estrada that, if he discharged Granger and Sapone, Garcia could invoke the change of counsel in requesting that Torres-Estrada be excluded from the first group of defendants scheduled for trial later in October.

On October 15, 2010, Granger and Sapone filed notices to withdraw from representing Torres-Estrada, which Granger said they did at Torres-Estrada's direction. According to Torres-Estrada, Garcia thereafter "repeatedly told [him] that the government was still considering his [counteroffer] of 162 months' (13 years, 6 months') imprisonment." In a sworn statement, Garcia reported that he had attempted to meet with AUSA Henwood "[s]ince December 2010," but received no response before the government resumed negotiations after the filing of the second indictment in February 2011.[9] According to the government, the plea negotiations were suspended when it developed evidence that, in addition to the previously charged conspiracy, Torres-Estrada "had also been a principal member of a narcotics importation organization that

---

[9] Garcia's statement was included as an attachment to a supplemental motion in which Torres-Estrada asked to file a reply to the government's response to his § 2255 motion. The district court denied the motion because the deadline for filing a reply had passed. However, Garcia's statement is largely consistent with the affirmations of Granger and Torres-Estrada, and we therefore choose to refer to the statement in recounting the background of the case. We note, in addition, that Torres-Estrada appears to correctly assert that the district court granted the government more leeway with deadlines than it allowed him.

brought large shipments of cocaine from the Dominican Republic to Puerto Rico."

**E. The Second Indictment, Plea Process, and <u>Lafler</u>-<u>Frye</u> Motion**

Torres-Estrada's circumstances in early 2011 were complex. In addition to the new charges in the importation indictment, Torres-Estrada was facing trial in March on the original charges.[10] According to Torres-Estrada, after the trial was set for March 21, Garcia told him he could get it delayed -- "thereby gaining more time to negotiate a plea bargain" -- because Garcia had another case going to trial in March that would take priority.[11] On March 18, 2011, Garcia met with Torres-Estrada at MDC Guaynabo. Although Torres-Estrada and Garcia recounted some details of this conversation differently, the basic thrust of Garcia's message was that the resumed plea negotiations were focused on a deal that would provide for a proposed sentence of 264 months (twenty-two years) in exchange for a guilty plea to both indictments. According to Torres-Estrada, Garcia recommended

_____

[10] Torres-Estrada was now among the first group of defendants to be tried, with the trial rescheduled from fall 2010 to March 2011.

[11] Garcia did file a motion to sever Torres-Estrada's case from those of the other defendants scheduled for trial in March based on the timing of the trial in his other case and on the need to obtain and review discovery related to the new indictment. Garcia also stated in the motion that he "had been negotiating with the government to try to reach a plea agreement that would have disposed of the case." The motion, which was filed on February 23, was denied on March 4.

that he agree to such a deal. That same day, Garcia filed a motion for a change of plea for Torres-Estrada, and the district court scheduled a change-of-plea hearing for March 21 -- the day jury selection was scheduled to start.

On the morning of March 21, Garcia presented Torres-Estrada with a plea agreement in writing for the first time. It contained the sentencing proposal that the attorney had partially described a few days earlier, allowing Torres-Estrada to request a sentence of 264 months (twenty-two years) but stating that the government reserved the right to argue for 288 months (twenty-four years). The agreement was in English, and because he has "only limited ability to read English," Torres-Estrada asked Garcia to help him review the document. Garcia then explained the provisions as they "browsed it together." In his affirmation, Torres-Estrada said he did not fully understand the provisions and was "frightened and confused," but he felt compelled to sign the agreement because "Mr. Garcia clearly was unprepared to begin the trial" that otherwise would have started that day.[12]

Within weeks after signing the plea agreement, Torres-Estrada "discharged" Garcia and hired new counsel -- part

---

[12] Negron-Hernandez also signed a consolidated plea agreement on the same day that resolved both cases against him. The agreement allowed Negron-Hernandez to request a sentence of 210 months (seventeen and one-half years) and the government to argue for 240 months' (twenty years') imprisonment.

of a flurry of changes in defense attorneys during the next couple of years that included a brief reappearance by Garcia and, most notably, the rehiring of Granger and Sapone in August 2011. In June 2012, in advance of Torres-Estrada's then-scheduled sentencing later that month, Granger filed a motion asserting that Garcia had rendered ineffective assistance of counsel and seeking an order that Torres-Estrada be given the benefit of the fifteen-year/eight-month (188-month) plea bargain the government had offered in September 2010.[13] This so-called Lafler-Frye motion, named for the two leading Supreme Court cases detailing the obligations of attorneys in plea negotiations, included a request for an evidentiary hearing. See Lafler v. Cooper, 566 U.S. 156 (2012); Missouri v. Frye, 566 U.S. 134 (2012). The district court denied the motion in September 2012 in a docket order, without explanation.

Roughly two-and-a-half years later, after the sentencing hearing was rescheduled multiple times for various reasons,[14] Torres-Estrada was sentenced in February 2015 to the twenty-four-year (288-month) term of imprisonment recommended by the

_____

[13] The affirmations of Granger and Torres-Estrada on which we have relied to describe the plea-bargaining process were submitted in connection with this motion.

[14] Some of the delay is attributable to the changes in defense counsel, including the second withdrawal of Granger and Sapone in January 2013.

government pursuant to the plea agreement. As described above, after we affirmed his conviction and sentence on direct appeal, Torres-Estrada unsuccessfully sought relief in the district court under § 2255 on the ground, inter alia, that Garcia's ineffective assistance deprived him of the more favorable fifteen-year/eight-month (188-month) plea deal originally offered by the government. In rejecting that claim, the district court concluded that Garcia's strategy was "sound," that the conduct challenged by Torres-Estrada as ineffective assistance of counsel "is nothing more than infighting between the attorneys caused or allowed by Torres-Estrada himself," and that Torres-Estrada had failed to show prejudice. Torres-Estrada, 2019 WL 1878294, at *6.[15]

As noted, we granted Torres-Estrada's request for a certificate of appealability on his Sixth Amendment claim, concluding that Torres-Estrada had raised an issue of deficient representation by Garcia "in relation to plea-bargain negotiations with the United States" sufficiently debatable to warrant our review. Torres-Estrada v. United States, No. 19-1485 (1st Cir.

---

[15] With respect to prejudice, the district court stated that "there is nothing in the record that shows that [Torres-Estrada] would have accepted [the government's original offer] . . . because even 'lead counsel' was advocating for a 14-year counter-offer" and Torres-Estrada "decided to authorize one for 13 years and 8 months." Torres-Estrada, 2019 WL 1878294, at *6. The court further observed that Torres-Estrada "has failed to show that the trial court would have accepted the 188-month sentencing recommendation." Id. at *7.

- 21 -

Feb. 23, 2022), ECF No. 15; see also, e.g., Feliciano-Rodríguez v. United States, 986 F.3d 30, 36 (1st Cir. 2021) (explaining that a petitioner seeking a certificate of appealability "must make 'a substantial showing of the denial of a constitutional right'" -- i.e., "'that the issues are debatable among jurists of reason'" (first quoting 28 U.S.C. § 2253(c)(2), then quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983))).  We now turn to our discussion of that claim.[16]

## II.

In Frye, the Supreme Court held for the first time that "the constitutional right to counsel extends to the negotiation and consideration of plea offers that lapse or are rejected," and it reiterated the longstanding principle that "[t]he right to counsel is the right to effective assistance of counsel."  566 U.S. at 138.[17]  In both Frye and Lafler, decided the same day, the

---

[16] Although Torres-Estrada asserts in his brief that Garcia was unprepared for trial in March 2011, and that he therefore felt pressure to sign the consolidated plea agreement on the morning the trial was scheduled to begin, this aspect of Garcia's alleged poor performance is undeveloped and outside the narrow scope of our review (limited to Garcia's plea-negotiation conduct).  We therefore do not further address this assertion.

[17] As the Court noted in Frye, prior cases had established that the Sixth Amendment applied to defense counsel's obligations "in advising a client with respect to a plea offer that leads to a guilty plea."  566 U.S. at 141 (discussing Hill v. Lockhart, 474 U.S. 52 (1985), and Padilla v. Kentucky, 559 U.S. 356 (2010)). The claims in those cases had focused on counsel's "incorrect advice" that "le[d] to acceptance of a plea offer."  Id. at 141-42.  Frye and its companion case, Lafler, differed because "[t]he

performance of defense counsel in the plea-bargaining process was determined to be constitutionally deficient.  See infra.  Torres-Estrada argues that his Sixth Amendment claim is equivalent to those considered in Frye and Lafler and that, based on the precedent they established, he is entitled to resentencing consistent with the government's original plea offer.  We review the law governing Torres-Estrada's Sixth Amendment claim, and the Supreme Court's application of that law in Frye and Lafler, before turning to Torres-Estrada's contention that he has established a constitutional violation entitling him to relief.

**A. The Ineffective-Assistance-of-Counsel Inquiry**

When evaluating a Sixth Amendment claim of ineffective assistance of counsel brought under 28 U.S.C. § 2255, we conduct a two-pronged inquiry, asking whether (1) counsel provided objectively deficient representation (the performance prong), and, if so, (2) is there "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong)?  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); see also Casey v. United States, 100 F.4th 34, 42 (1st Cir. 2024).  "The petitioner bears a heavy burden on each prong."  Casey, 100 F.4th at 42.

---

challenge[s] [were] not to the advice pertaining to the plea that was accepted but rather to the course of legal representation that preceded it with respect to other potential pleas and plea offers." Id.

Attorney performance will be found deficient "[o]nly when counsel's strategy was 'so patently unreasonable that no competent attorney would have made it.'" Watson v. United States, 37 F.4th 22, 28 (1st Cir. 2022) (quoting Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010)). For claims asserting deficient performance in plea negotiations, the prejudice prong requires defendants to prove that "the outcome of the plea process would have been different with competent advice." Lafler, 566 U.S. at 163. That is, "defendants must demonstrate a reasonable probability they would have accepted" a lower plea offer and that "the plea would have been entered without the prosecution canceling [the offer] or the trial court refusing to accept it." Frye, 566 U.S. at 147; see also Rivera-Rivera v. United States, 844 F.3d 367, 372-73 (1st Cir. 2016).

In reviewing the district court's rejection of Torres-Estrada's claim of ineffective assistance of counsel, we assess any factual findings for clear error and the court's legal conclusions de novo. See Casey, 100 F.4th at 44. Both prongs of the ineffective-assistance "inquiry are mixed questions of law and fact," United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012) (quoting Strickland, 466 U.S. at 698), and the applicable standard of review depends on whether "a particular question is fact-dominated or law-dominated," id. (quoting Dugas v. Coplan, 506 F.3d 1, 8 (1st Cir. 2007)). The district court did not hold

an evidentiary hearing and thus made no explicit findings of fact. We see the inquiry here as law-dominated and, accordingly, review the district court's decision de novo.

## B. **Frye** and **Lafler**

In Frye and Lafler, the Supreme Court addressed two different scenarios in which defendants claimed that their attorneys' ineffective assistance caused their failure to take advantage of a plea offer, with the result that "further proceedings led to a less favorable outcome." Lafler, 566 U.S. at 160; see also Frye, 566 U.S. at 138. As we shall describe, both scenarios inform our assessment of the case now before us.

In Frye, the defendant's attorney never told his client that the prosecutor had offered two possible plea bargains and had given an expiration date for making a choice. See 566 U.S. at 138-39. The offers lapsed, and Frye subsequently pled guilty without a plea agreement, subjecting him "to a maximum sentence of four years instead of one year." Id. at 139-40 (internal quotation marks omitted). The Court (a five-justice majority) concluded that Frye's attorney, by failing to "make a meaningful attempt to inform the defendant of a written plea offer before the offer expired," id. at 149, had provided representation that "fell below an objective standard of reasonableness," id. (quoting Strickland, 466 U.S. at 688).

- 25 -

The prejudice prong of the Strickland inquiry was less straightforward. By the time of the scheduled preliminary hearing and guilty plea, Frye had committed an additional offense. See id. at 139, 151. The Supreme Court observed that the new arrest, among other considerations, gave "reason to doubt that the prosecution would have adhered to the agreement or that the trial court would have accepted it . . . unless they were required by state law to do so." Id. at 151. The Court therefore remanded the case to the state appeals court so it could address the state-law questions bearing on the prejudice question "in the first instance." Id.

In Lafler, the defendant was charged with five state-law crimes related to his shooting of a woman who survived his assault. Id. at 161. The prosecutor initially offered to dismiss some of the charges and to recommend a negotiated sentence covering the remaining charges. Id. Based on the incorrect understanding that the defendant "could not be convicted at trial,"[18] defense counsel

---

[18] As the Supreme Court described the alleged circumstances, defense counsel had told Lafler he "could not be convicted for assault with intent to murder as a matter of law" because he had shot the victim below the waist. 566 U.S. at 174. That assurance rested on an objectively incorrect explanation of the law. See id. at 161-63 (noting the Sixth Circuit's determination that counsel had informed Lafler of "an incorrect legal rule" (quoting Cooper v. Lafler, 376 Fed. App'x 563, 570 (2010))). The case came to the Supreme Court with all parties agreeing that counsel's performance "was deficient when he advised [Lafler] to reject the plea offer on the grounds he could not be convicted at trial." Id. at 163.

advised his client to reject that plea offer and the defendant also rejected another plea deal offered on the first day of trial. Id. at 163. The defendant thereafter had "a full and fair trial," in which the jury found him guilty on all counts. Id. at 160-61. He was sentenced to a "mandatory minimum sentence of 185 to 360 months' imprisonment," id. at 161, which the Supreme Court observed was a minimum more than three times longer than the minimum in the original plea offer (fifty-one months), id. at 174.

The Court found that Lafler had satisfied Strickland's two-part test for ineffective assistance of counsel claims: The parties had conceded that defense counsel's performance was deficient, and the defendant "ha[d] shown that but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea." Id. The Supreme Court remanded the case for further proceedings so the trial court could determine an appropriate remedy. See id. at 174-75.[19]

---

[19] Lafler's case was in federal court pursuant to a petition for habeas relief under 28 U.S.C. § 2254. The district court had "ordered specific performance of the original plea agreement," but the Supreme Court stated that "[t]he correct remedy in these circumstances . . . is to order the State [of Michigan] to reoffer the plea agreement." 566 U.S. at 174. The Court explained that, if the defendant accepted the renewed offer, the state trial court would have discretion to determine how to proceed. Id. Among the choices noted by the Court were vacating the convictions, with resentencing pursuant to the plea agreement, and "leav[ing] the convictions and sentence from trial undisturbed." Id. (citing a state rule giving the court such discretion).

In addition to the guidance provided by these two fact patterns, the justices in Frye made general observations about plea negotiations that are pertinent here. The Court acknowledged the challenge of "defin[ing] the duty and responsibilities of defense counsel in the plea bargain process," 566 U.S. at 144, and noted the "nuanced" nature of "[t]he art of negotiation," id. (quoting Premo v. Moore, 562 U.S. 115, 125 (2011)); see also Premo, 562 U.S. at 124 ("Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks."). The Frye Court then continued:

> Bargaining is, by its nature, defined to a substantial degree by personal style. The alternative courses and tactics in negotiation are so individual that it may be neither prudent nor practicable to try to elaborate or define detailed standards for the proper discharge of defense counsel's participation in the process.

566 U.S. at 145. The Court observed that, in any event, it had no need to formulate such standards for Frye's situation because it was clear that Frye was denied "the effective assistance the Constitution requires" when "counsel allowed the [plea] offer to expire without advising [him] or allowing him to consider it." Id.

With this background in mind, we turn to Torres-Estrada's claim that Garcia's representation was

- 28 -

constitutionally deficient and that he would have achieved a more favorable plea-bargaining outcome "with competent advice." Lafler, 566 U.S. at 163.

**III.**

We have no doubt that Garcia overstepped his intended role as local counsel during the plea-bargaining process.[20] Most significantly, he interrupted the carefully planned negotiation session with AUSA Henwood on September 28, 2010, to make an unauthorized counteroffer, and he met with Torres-Estrada independently -- and secretly -- to persuade him to demand a lower proposed sentence than the one that had been agreed upon by the two defendants and all five defense attorneys (including Garcia). Garcia also attempted to meet independently with the government while Granger and Sapone remained the lead attorneys and, after they withdrew, he may have misrepresented (or at least overstated) the status of the plea negotiations when he told Torres-Estrada that the government was still considering the specific counteroffer of thirteen years/six months (162 months).

---

[20] The district court noted that neither the federal nor Puerto Rico rules governing criminal procedure "make a distinction between lead and local counsel," and thus "all counsel appearing in a case are fully accountable to their client and the court regardless of the term used." Torres-Estrada, 2019 WL 1878294, at *4. Granger and Sapone, however, viewed Garcia's role as more limited than theirs as lead counsel, and Torres-Estrada agreed to that limitation.

But acknowledging certain of Garcia's actions as troubling does not inevitably mean that his actions denied Torres-Estrada the effective assistance of counsel. To determine whether Torres-Estrada has satisfied Strickland's requirements for establishing a Sixth Amendment violation, we think it useful to separately examine the two primary aspects of Garcia's representation challenged by Torres-Estrada: first, his conduct leading up to, and during, the defense's presentation of a counteroffer on September 28, and, second, his advice to Torres-Estrada apart from that meeting.

## A. The September 28 Negotiation Session

Before assessing the details surrounding the September 28 meeting, we note that the facts here are a far cry from those at issue in Frye, which involved "an uncommunicated, lapsed plea" offer from the government. 566 U.S. at 148. Unlike the defendant in Frye, Torres-Estrada had knowledge of the government's original plea proposal, and he was also an active participant in his plea process. Lafler is a closer analog in that it involves adverse consequences from the defendant's reliance on his attorney's advice. Indeed, Garcia's conduct at the September 28 meeting was arguably even more problematic because he made a counteroffer more aggressive than his co-counsel reported the client had authorized.

Yet, the relevant considerations in evaluating Garcia's conduct materially differ from those in Lafler. Here, in Garcia's

- 30 -

last face-to-face meeting with Torres-Estrada, Torres-Estrada authorized the aggressive proposal of thirteen years. That authority was called into question only by the assertions of his co-counsel just before the meeting with AUSA Henwood began. Moreover, a counteroffer of thirteen years does not preclude making a subsequent offer of thirteen years and eight months, and in that sense can be seen as an aggressive preparing of the ground for the less-aggressive final offer. Finally, added to this mix is the fact that unlike in Lafler, Garcia's strategy was not objectively wrong in its understanding of the law. See 566 U.S. at 162. In fact, after Garcia blindsided Granger and Sapone with his thirteen-year proposal on the eve of the scheduled plea-negotiation meeting, the lead attorneys and Torres-Estrada settled on a lower counteroffer than initially contemplated for the defense team to propose to Henwood the following day. And when Garcia subsequently undercut that compromise counteroffer by another two months at the meeting (requesting thirteen years/six months, after quickly adjusting upward from the immediately rebuffed thirteen years), Henwood still responded by saying he would think about it.

The circumstances surrounding the meeting thus diminish the force of Torres-Estrada's claim that Garcia's disruptive actions were incompatible with an attempt by competent counsel to secure the best possible deal for his client. Given Henwood's stated willingness at the meeting to consider Garcia's rogue

thirteen-year/six-month (162-month) proposal, one could reasonably say that Garcia's aggressive (though discourteous) tactics had advanced the plea negotiations and, accordingly, were "within the range of competence demanded of attorneys in criminal cases." Strickland, 466 U.S. at 687 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)); see also id. at 689 ("There are countless ways to provide effective assistance in any given case.").

But even if we were to conclude that Garcia's disregard of his co-counsel's and client's agreed-upon and more conservative plan for the negotiation session amounted to deficient performance, Torres-Estrada could not demonstrate ineffective assistance of counsel on that basis because he would still be unable to satisfy Strickland's prejudice prong. Despite Granger and Sapone's view that the meeting with Henwood had gone poorly because of Garcia's interference, the record makes plain that Garcia's conduct did not result in termination of the plea-bargaining process. Rather, as Granger reported to Garcia, after Henwood was told that Garcia "spoke out of turn and inconsistent with Mr. Torres-Estrada's instructions," Henwood "on that basis . . . agreed to revisit" the possibility of lowering the offers to both defendants. And, as late as October 14 -- more than two weeks after Garcia's hijacking of the negotiation session -- the original offer of fifteen years/eight months (188 months) remained on the table. See supra. Indeed, Granger filed a motion on October 13

- 32 -

asking to extend the original deadline for the acceptance of a plea deal, originally set for that day, because the parties were still in active plea negotiations.

In sum, we need not view Garcia's disruptive performance in advance of, and during, the September 28 meeting as entirely defensible to conclude that Torres-Estrada has failed to establish a violation of his Sixth Amendment right to the effective assistance of counsel based on Garcia's interactions with lead counsel and Henwood. Before the September 28 plea negotiations -- and beyond -- all of his attorneys were counseling Torres-Estrada to push for a more lenient plea deal, and the government's original offer remained available well after that meeting. Moreover, given Henwood's reaction at the meeting to Garcia's second counteroffer, and the continuing discussion of a possible lower sentencing proposal, the record fails to show that Garcia's meeting-related tactics affected "the outcome of the plea process," as required to satisfy Strickland's prejudice prong. Lafler, 566 U.S. at 163.

## B. The Advice to Prolong the Plea Negotiations

Both contemporaneously with the events surrounding the September 28 meeting and, in its aftermath, Garcia gave Torres-Estrada advice that Torres-Estrada now challenges as constitutionally deficient. Garcia told Torres-Estrada that he could, and should, wait to accept a plea deal until after the first

trial of his co-defendants. He posited that the outcome of the trial could lead the government to make a more favorable offer, and he assured Torres-Estrada that, as a local attorney, he knew better and could secure a lower sentence than his New York-based lead counsel. Immediately after Henwood reported that the government would stick to its original plea offer -- in mid-October 2010 -- Garcia urged Torres-Estrada to discharge Granger and Sapone because it would delay his trial and give Garcia time to negotiate a better deal. Garcia subsequently told Torres-Estrada that the rejected offer of thirteen years/six months (162 months) was still being considered by the government when that consideration may have been Garcia's hope but not necessarily the reality.

As indicated above, Garcia's advice to Torres-Estrada is distinguishable from the attorney's assurances in Lafler because it amounted to a subjective assessment about the possible outcome of the plea-negotiation process rather than the guarantee of a particular outcome, based upon an incorrect statement of law, that Lafler's attorney gave to him. See supra note 18. As the government points out, advising a defendant to delay accepting a plea is not a novel strategy, and, in certain circumstances, might even prove advantageous -- for example, if an intervening trial of co-defendants reveals weaknesses in the government's evidence. See, e.g., Premo, 562 U.S. at 125 (noting that the government's "case can begin to fall apart as stories change, witnesses become

- 34 -

unavailable, and new suspects are identified"). Of course, as it turned out, Garcia plainly overestimated the strength of Torres-Estrada's prospects. When the initial trial was rescheduled to March, Torres-Estrada was included in the first group of defendants. At the same time, the government was moving toward the second indictment.

With the benefit of hindsight, Torres-Estrada argues that Garcia's strategy of delay was so risky -- "so patently unreasonable" -- that "no competent attorney would have [pursued] it." Watson, 37 F.4th at 28 (quoting Tevlin, 621 F.3d at 66). But Garcia's performance cannot be evaluated based on what transpired later. See, e.g., Miller v. United States, 77 F.4th 1, 6 (1st Cir. 2023) (stating that, when "appraising counsel's performance, . . . we must make 'every effort . . . to eliminate the distorting effects of hindsight'" (second ellipsis in original) (quoting Strickland, 466 U.S. at 689)). As the Supreme Court noted, plea negotiations are by their nature "suffused with uncertainty," and, inevitably, the results of a defense attorney's "balancing [of] opportunities and risks" will not always be successful. Premo, 562 U.S. at 124. If the government had been unable to develop sufficient evidence to charge Torres-Estrada in the importation conspiracy, Garcia's effort to extend the plea

negotiations on the first indictment may have had a more favorable outcome.[21]

Indeed, if Garcia had been Torres-Estrada's only attorney and had advised the same aggressive strategy of delaying acceptance of the government's offer while pursuing a better deal, we could not say that Garcia's tactics -- i.e., his "personal style" of bargaining, Frye, 566 U.S. at 145 -- amounted to ineffective assistance of counsel, despite the strategy's ultimate lack of success. The counteroffers that the attorneys had planned to make at the September 28 meeting -- twelve years (144 months) for Negron-Hernandez and thirteen years/eight months (164 months) for Torres-Estrada -- featured the same twenty-month differential contained in the government's original plea offer (fourteen years and fifteen years/eight months). Garcia's attempt to slightly narrow that gap for Torres-Estrada, and his continuing effort to move the needle away from the government's original proposal, may

_____

[21] The impact of the second indictment on the government's approach to a plea deal is reflected in Negron-Hernandez's efforts to reach an agreement. On November 30, 2010, his attorney filed a motion asking for another extension of the deadline for finalizing plea negotiations, explaining that "[t]he prosecutor apparently due to the heavy workload has been unable to inform defendant of the final terms of a plea offer which includes the forfeiture provisions." Then in February, roughly a week after the second indictment was issued, Henwood emailed Negron-Hernandez's attorney stating that the circumstances had changed: "You guys are going to have to tell him that the new offer will be higher based on the new case, if he insists on the 13 years he is going to have to face two trials."

have been unduly optimistic, but we cannot say that his approach falls short of professional competence on the record before us. See, e.g., Feliciano-Rodríguez, 986 F.3d at 37 (stating that deficient performance will be found "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it" (emphasis added) (quoting Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006))).

Notably, as described in our earlier discussion, Henwood did not dismiss Garcia's adjusted proposal out-of-hand at the September 28 meeting, an indication that Garcia's attempt to revive negotiations over that counteroffer -- or some offer lower than the original fifteen years/eight months (188 months) -- was not inevitably a non-starter. Indeed, Negron-Hernandez's attorneys apparently continued negotiating for a more favorable plea agreement covering the first indictment through early 2011, and the offer being discussed when the second indictment was issued (a defense recommendation of thirteen years (156 months) instead of fourteen years (168 months)) would have been more favorable to Negron-Hernandez than the government's original offer. See supra note 21.[22] In addition, one of the timing constraints that Henwood

---

[22] We recognize that the government may have been more willing to negotiate with Negron-Hernandez than with Torres-Estrada and, indeed, the district court's docket indicates active plea negotiations for him through the fall. The district court granted a request to extend the deadline for Negron-Hernandez to complete plea negotiations until December 27, and his attorney subsequently

had imposed -- the entry of guilty pleas before the first trial in the case -- shifted shortly after Henwood told Granger the government's offer would not be lowered. Roughly a week after Henwood's communication, the late-October trial date was being reconsidered, and, on November 30, the court rescheduled the trial -- now including Torres-Estrada -- for March.

For the most part, then, Garcia's advice considered in isolation (apart from the contrary advice offered by Granger and Sapone) was not "so patently unreasonable that no competent attorney would have made it." Watson, 37 F.4th at 28 (quoting Tevlin, 621 F.3d at 66). Although Torres-Estrada emphasizes the conflict among his attorneys,[23] neither the fact that Granger and

---

sought another extension to January 12, 2011. The latter motion was denied as moot in March after Negron-Hernandez entered into his consolidated plea agreement. Regardless of any differences in the government's approach to the two defendants, it is pertinent in assessing Garcia's strategy that Negron-Hernandez's attorneys, like Garcia, continued efforts to obtain a more favorable plea deal on the first set of charges.

[23] Torres-Estrada does not explicitly assert that Granger and Sapone advised him to accept the government's original offer in October 2010 after Henwood communicated the government's rejection of counteroffers. As Torres-Estrada had instructed -- at Garcia's suggestion -- the two attorneys moved to withdraw from the case the day after Granger reported hearing from Henwood. However, we think a recommendation to accept the offer at that point is implicit in the guidance they did give -- i.e., that the original offers to Torres-Estrada and Negron-Hernandez were "excellent," that counteroffers were appropriate when the government's offers had not yet been described as final, and that time was of the essence in making a plea deal.

- 38 -

Sapone disagreed with Garcia's advice nor Torres-Estrada's feeling "confused and nervous" when faced with his attorneys' conflicting views means that Garcia's performance was deficient. By its nature, plea-bargaining can involve difficult choices: whether to take an offered plea, whether to make a counteroffer, and whether to reject a plea deal and leave one's fate in the hands of a jury. Torres-Estrada's decision on how to respond to the government's "final" offer inevitably would have been stressful even if he had only one defense attorney presenting him with the risks and advantages of various incompatible strategies similar to those presented by his multiple attorneys here.[24]

One aspect of Garcia's performance, however, requires particular attention: his repeated assurance that the government was still considering the specific counteroffer of thirteen years/six months (162 months). Torres-Estrada stated in his declaration that Garcia made that representation from the time he

---

[24] In making this observation, we note that the multiple-attorney situation uniquely poses the possibility of conflicts over defense strategy. We cannot anticipate what disagreements may arise among members of a defense team, and we therefore speak only to the nature of the conflict that arose here. As we have described, Torres-Estrada faced competing, competent advice about the balancing of risk versus possible benefit that is an inherent part of plea negotiations. Even if Garcia's disagreement with the lead attorneys made the choice of strategy more difficult than if one attorney had outlined various options, Torres-Estrada's struggle nonetheless reflected only the typical predicament of defendants weighing their options in plea negotiations rather than any deficiency in Garcia's performance.

(Torres-Estrada) discharged the lead attorneys "until a few days before" he pleaded guilty. We found no evidence in the record of ongoing consideration by the government of that specific counteroffer during that time period -- or, for that matter, any evidence of the government's response to Garcia's efforts to secure a better deal. In other words, the record lacks details on Garcia's interactions with the government after Granger and Sapone withdrew.[25]

Nevertheless, for the purpose of resolving the issue before us, we will assume favorably to Torres-Estrada that Garcia did misrepresent the state of the negotiations when he repeatedly indicated -- after Henwood had said that the government would not reduce its offer of fifteen years/eight months (188 months) --

_____

[25] Although the record does not reveal the government's bargaining position toward Torres-Estrada in the months after Henwood reported in October 2010 that the government offer would not be reduced, there is evidence that the parties were engaged in plea negotiations during that period. In its response to Torres-Estrada's pre-sentencing Lafler-Frye motion, the government stated that "[p]rior to the second indictment, the parties had been negotiating a plea that would have resolved [Torres-Estrada's] criminal liability" under the first indictment, and in its brief on appeal, the government described those negotiations as continuing until "the new criminal charges were imminent." The government also pointed out in its brief that "the same situation occurred with co-defendant" Negron-Hernandez and noted that his negotiations continued "even after October 2010." In addition, as recounted above, in a motion Garcia filed in February 2011 seeking to sever Torres-Estrada's case from those of the other defendants scheduled for trial the next month, Garcia stated that he "had been negotiating with the government to try to reach a plea agreement."

that the government was still actively considering the thirteen-year/six-month (162-month) counteroffer that Garcia had made at the September 28 meeting with Henwood.[26] Even if those misrepresentations amounted to deficient performance,[27] however, Torres-Estrada could not satisfy the prejudice prong of his Sixth Amendment claim because the record shows that the statements, given their timing, had no impact on his loss of the government's offer.

That is to say, the timing of Garcia's comments relative to Torres-Estrada's decision-making ends up being critical to our prejudice analysis. In describing his decision to sign onto Garcia's strategy in October 2010, Torres-Estrada said he did so after Garcia told him he "would be able to obtain a better deal" and that Garcia "would continue trying to obtain an offer of 162 months' (13 years, 6 months') imprisonment." (Emphasis added.)

---

[26] In making that assumption, we note that the government bears some responsibility for the lack of a more detailed record on this issue, having argued to the district court that Torres-Estrada's § 2255 motion should be denied without an evidentiary hearing. Nor does the government in its brief to us provide its understanding of the status of the thirteen-year/six-month counteroffer after mid-October 2010 and before it suspended plea negotiations on the first indictment.

[27] Although we raise the possibility of deficient performance based on Garcia's falsely telling his client that the thirteen-year/six-month counteroffer was under active consideration, we again note the significant differences from Frye and Lafler, where the attorneys either failed to convey a plea offer at all (Frye) or gave advice based on a mistaken understanding of the law (Lafler). Here, the assumed misrepresentation was limited to telling Torres-Estrada that the best-case outcome for the renewed plea negotiations was currently being considered.

Garcia's stated goal, in other words, was to lower the government's original offer of fifteen years/eight months (188 months), ideally by resurrecting the thirteen-year/six-month (162-month) deal that Garcia had proposed at the September 28 meeting and that Henwood later rejected. But, despite Garcia's confidence about his negotiating ability, he made no claim that he could obtain that specific deal before Torres-Estrada decided in October 2010 to "follow[] Mr. Garcia's advice" to discharge Granger and Sapone and allow Garcia to continue negotiating. Hence, the record makes clear that Torres-Estrada's decision to forgo the government's offer at that time did not depend on the thirteen-year/six-month deal. Indeed, Torres-Estrada knew that the government had just rejected that counteroffer, and he thus necessarily understood that any reconsideration of it by the government at that point would simply reflect Garcia's "trying to obtain" it.

According to Torres-Estrada, Garcia's misrepresentations about the government's actual consideration of the thirteen-year/six-month counteroffer only began thereafter, i.e., "[f]rom the time that [Torres-Estrada] discharged . . . Granger and Sapone." Yet, by this point, Torres-Estrada had already made the decision to accept the risk of delaying acceptance of the government's offer based only on Garcia's assertion that he would be able to improve the government's offer, and not necessarily by obtaining the previously rejected thirteen-

year/six-month deal.  To be sure, Garcia's repeated representations about that deal may have amplified Torres-Estrada's hope that the government would agree to it.  We cannot conclude, however, that Garcia's statements about the government's actual consideration of that counteroffer were the reason Torres-Estrada stuck with Garcia's strategy during the limited relevant timeframe -- i.e., from mid-October 2010, when Torres-Estrada chose Garcia's approach, and the point when the government decided to suspend negotiations on the first indictment in anticipation of the second indictment.[28]

Garcia's representations about the thirteen-year/six-month counteroffer during that period, even if misleadingly based on what he was seeking rather than on any signal from the government, were simply a version of the same over-confident claim that had prompted Torres-Estrada to discharge Granger and Sapone in the first place -- i.e., that Garcia would be able to negotiate a better deal for him than his lead attorneys and that he was trying for the one he had proposed at the September 28 meeting.

---

[28]  We think it likely that the government considered the new charges "imminent" by late December 2010 or early in January 2011. See supra note 25.  We infer that timing from two facts: Negron-Hernandez received no response to his late December request to extend the deadline for his plea negotiations to January 12, and the second indictment was filed in early February.  See id. The government states that it resumed negotiations after the second indictment "so that the parties could negotiate a consolidated plea agreement that would dispose of both cases."

- 43 -

Torres-Estrada chose Garcia's aggressive strategy with no guarantee of its outcome, and despite explicit warnings from Granger and Sapone that delay could result in the government's withdrawing or increasing its offer for reasons that included the filing of new charges.[29] We see no reasonable probability that, but for Garcia's repeated assurances that the government was deliberating about the specific thirteen-year/six-month proposal, Torres-Estrada would have abandoned his commitment to Garcia's aggressive strategy -- and the goal of obtaining some better deal -- before the government's offer was off the table. See Frye, 566 U.S. at 147 (explaining that ineffective-assistance-of-counsel claims premised on the loss of a more favorable plea deal require defendants to demonstrate, inter alia, "a reasonable probability" that they would have accepted the lower plea offer before "the prosecution cancel[ed] it"). Hence, even if Garcia's reports on the thirteen-year/six-month counteroffer misrepresented the status of that specific deal, Torres-Estrada has failed to show that those

---

[29] As noted, see supra Section I.B, Granger stated that the government's original plea offer included a verbal promise that it would not pursue new charges against Torres-Estrada. The government maintains that, even if the parties "agreed to the proposed terms in September of 2010, [Torres-Estrada] still would have faced a subsequent indictment." We need not dwell on the scope of Henwood's promise, however, because whether the government's original offer would have foreclosed the second indictment would be a pertinent issue only if Torres-Estrada could show that he would have accepted that offer while it remained available.

statements led to a less favorable sentencing outcome -- i.e., that he would have accepted the government's original offer before "the prosecution cancel[ed] it." Frye, 566 U.S. at 147.

**\*\*\***

In sum, we cannot conclude that Garcia's plea-negotiation performance amounted to "constitutionally deficient" representation that resulted in Torres-Estrada losing a more favorable plea deal than the one he ultimately obtained. Walker v. Madeiros, 911 F.3d 629, 633 (1st Cir. 2018). We thus hold that Torres-Estrada has failed to show a violation of his Sixth Amendment rights and, accordingly, affirm the district court's denial of his request for sentencing relief.

So ordered.